IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHRISTOPHER SPENCE, | § | |
| | § | No. 298, 2014 |
| Defendant Below-Appellant, | § | |
| | § | Court Below: |
| | § | |
| v. | § | Superior Court of the |
| | § | State of Delaware, in and for |
| | § | New Castle County |
| STATE OF DELAWARE, | § | |
| | § | Cr. I.D. No. 1208011625A |
| Plaintiff Below-Appellee. | § | |

Submitted: September 24, 2015
Decided: November 13, 2015

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Eugene J. Maurer, Jr., Esquire*,* Wilmington, Delaware for Appellant.

Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Defendant-Below, Appellant, Christopher Spence ("Spence"), appeals from a Superior Court Order denying his Motion for a Mistrial. We AFFIRM the ultimate holding of the trial court based largely upon the well-reasoned Order denying Spence's Motion, but with three exceptions to the trial court's underlying analysis. The exceptions relate, in part, to the State's use of a PowerPoint presentation during its closing argument.

## I.     FACTUAL AND PROCEDURAL HISTORY[1]

This case arises from a shooting that occurred during an event at a party venue located at 1232 King Street in Wilmington, Delaware. During the shooting, Spence shot and killed Kirt Williams ("Williams"), and shot and wounded Kelmar Allen ("Allen"). Because Spence admitted to shooting Williams and Allen, the case centered on: (1) whether the State could prove each element of the indicted charges beyond a reasonable doubt; (2) whether Spence was guilty of lesser included offenses; and (3) whether Spence had a viable justification defense, either self-defense or defense of others.

The trial commenced December 3, 2013. Over the course of the trial, the State called twenty-one witnesses to testify in support of its case. Spence called three witnesses, including himself, to testify in support of his case.

Spence testified at trial that, during the party, certain threats were made and a fight occurred between members of a gang known as the "Sure Shots" and friends of his. Spence's defense focused on the gang's reputation for violence. At the party and while they were waiting for an elevator, Spence approached two individuals—Allen and

---

[1] The facts are taken from the May 15, 2014 Order of the Superior Court denying Spence's Motion for a Mistrial and from the record below.

Williams—whom Spence associated with the Sure Shots. Spence had a pump-action shotgun in his hands, which he had been handed by a man known as "Trini" moments before. Spence testified that, after he approached the victims, he perceived Williams, also known as "Little Man" and "Short Man," reaching for his waist. At that point, Spence fired multiple shots at Williams and Allen because he feared for his safety and for that of his friends.

On cross-examination with respect to his justification defenses, Spence testified that he did not call the police prior to the shooting because they would have broken up the party. Spence also stated that he had the opportunity to leave safely before he approached the victims with the shotgun, and continued to have that opportunity after he began to fire the weapon. He testified as follows:

Q. But you had opportunities to get away before any of this?

A. Yeah.

Q. Before you took the shotgun you had an opportunity to leave; right?

A. Right.

Q. After you fired the first shot, you could have left?

A. Yeah. I could have.

Q. But you didn't?

A. But I want to make sure that everybody was safe.

Q. You want to make sure they were dead?

A. Yes.

Although Spence testified that he fired three shots at the victims, other witnesses, forensic evidence, and expert testimony suggested that four shots were fired. Williams's body was found by Wilmington police in the elevator of the party venue. Spence did not see either victim with a firearm, as he testified at trial:

Q.    You never saw Kirk Williams or Kelmar Allen with a gun?

A.    No.

Q.    Never heard they had a gun? You just --

A.    No.

Q.    -- assumed it?

A.    Yes.

In fact, no weapons—including the pump-action shotgun—were recovered at the scene, nor were any discovered on Williams's body. No witness testified that they saw a weapon on Allen or Williams during the party. Allen survived the shooting, despite receiving gunshot wounds.

Moments before closing argument, the State provided defense counsel with a black and white copy of the PowerPoint presentation it intended to use during summation. The version of the PowerPoint presentation displayed to the jury was in color (the "PowerPoint"). During the State's closing argument, the defense objected to two statements in which the State suggested of Spence: "he wants you to believe his story." After the prosecution's closing argument, the defense objected to a slide in the PowerPoint on which the word "MURDER" appeared in red lettering, and which was juxtaposed with an image of Williams's deceased and bloodied body. The defense also

3

objected to statements which Spence alleges undermined the dangerousness of the Sure Shots while the State was simultaneously prosecuting members of the gang for violent crimes.

On December 18, 2013, upon the conclusion of closing arguments, the trial court instructed the jury on the law governing the case. The jury instructions were the product of a lengthy prayer conference. The trial court included instructions regarding all the indicted offenses, lesser included offenses, and the two justification defenses. The jury instructions also contained instructions regarding "Credibility of Witnesses" and "Attorney's Belief or Opinion."[2] The parties had no exceptions to the instructions. In addition, Spence did not raise any objections to the instructions in his later-filed Motion for a Mistrial (the "Motion") or Memorandum in Support of the Defendant's Motion for Mistrial (the "Memorandum"). The trial court provided each juror with a copy of the jury instructions to use during deliberations. While the trial court did make the State's closing argument PowerPoint a court exhibit, it did not allow the PowerPoint to go back with the jury during its deliberations.

At the end of closing arguments, Spence's counsel moved for a mistrial based on the alleged instances of prosecutorial misconduct. The trial court reserved ruling on the motion until after trial.

---

[2] In the "Attorney's Belief or Opinion" instruction, the trial court instructed the jury that ". . . it is not proper for an attorney to state a personal opinion as to the truth or falsity of any testimony or evidence or on the guilt or innocence of an accused. What an attorney personally thinks or believes about the testimony or evidence in a case is simply not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence which an attorney offers during opening statements or closing arguments, or at any other time during the course of the trial." B292 (Tr. 120:8-18).

4

On December 19, 2013, the jury deliberated for less than six hours, ultimately returning a verdict of guilty on the indicted offenses of Murder in the First Degree, Attempted Murder in the First Degree, Reckless Endangering in the First Degree, and three counts of Possession of a Firearm During the Commission of a Felony.

On December 27, 2013, Spence, through counsel, filed the Motion on the basis of prosecutorial misconduct. He supplemented the Motion with the Memorandum, on January 27, 2014. Spence argued that a mistrial was appropriate due to six alleged instances of prosecutorial misconduct during closing arguments at his trial. He had objected to three such purported instances during the trial. In the Motion and the Memorandum, Spence raised, for the first time, objections to the following: (1) two PowerPoint slides which referred to the victims as "helpless;" (2) PowerPoint slides containing alleged misstatements of the justification defenses; and (3) a PowerPoint slide containing the statement that "[t]he defendant is guilty of all the charges against him[.]" The trial court denied the Motion.

## II.    THE PARTIES' CONTENTIONS ON APPEAL

This appeal centers on the same six instances of alleged prosecutorial misconduct that were raised in the proceedings below. On appeal, Spence contends that the trial court erred when it denied the Motion. He argues that the State made improper statements during its closing argument, including statements contained in the State's PowerPoint, that unfairly prejudiced the jury's deliberative process. The State counters by asserting that the prosecutor's closing remarks and visual aids were within the bounds of permissible commentary on the evidence and, therefore, did not constitute misconduct.

5

Further, the State contends that, even if the actions did constitute prosecutorial misconduct, a mistrial was unwarranted.

## III.   STANDARD OF REVIEW

"[O]ur standards for reviewing prosecutorial misconduct are slightly different depending on whether the issue was fairly presented below.  If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for 'harmless error.'  If defense counsel failed to do so and the trial judge did not intervene *sua sponte*, we review only for plain error."[3]  The trial court analyzed the objections in this fashion, as do we.[4]

## IV.   ANALYSIS

### A.   Harmless Error Review of the Timely Objections

First, we consider the three objections that were made in a timely fashion.  Under harmless error review, we perform a *de novo* review of the record and determine whether the prosecutor's actions were improper.[5]  If no misconduct occurred, the analysis ends.  If misconduct has occurred, then we must determine "whether the misconduct prejudicially affected the defendant."[6]  To determine whether the misconduct prejudicially affected the defendant, we apply the three factors indentified in *Hughes v.*

---

[3] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006) (citation omitted).
[4] The trial court reviewed, under the harmless error standard, one objection made during the State's closing argument and two objections made immediately after.  It reviewed the three objections made after trial under the plain error standard.
[5] *Kirkley v. State*, 41 A.3d 372, 376 (Del. 2012) (citing *Baker*, 906 A.2d at 148).
[6] *Id.* (citing *Baker*, 906 A.2d at 148).

*State*,[7] which are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error (the "*Hughes* test").[8] "The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two."[9]

Even if the conduct is not found to have prejudiced the defendant under *Hughes*, Delaware courts must apply the test articulated in *Hunter v. State*,[10] which considers "whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process" (the "*Hunter* test").[11]

Thus, we first examine whether there has been prosecutorial misconduct through a harmless error review. Spence's three timely objections include the following: (1) during the State's closing argument, Spence objected to the statement, "[t]hat's what Christopher Spence said in front of you, because he wants you to believe his story[;]"[12] (2) after the State's closing argument, Spence objected to a PowerPoint slide that was displayed during the closing, which showed the word "MURDER" in large, red lettering and juxtaposed with an image of Williams's body ("Slide 067"); and, (3) after the State's closing argument, Spence objected to certain statements that, he argued, undermined the dangerousness of the Sure Shots at a time when the State was simultaneously prosecuting members of the gang for multiple acts of violence in other criminal proceedings.

---

[7] 437 A.2d 559 (Del. 1981).
[8] *Id.* at 571 (quoting *Dyson v. United States*, 418 A.2d 127, 132 (D.C. App. 1980)).
[9] *Baker*, 906 A.2d at 149.
[10] 815 A.2d 730 (Del. 2002).
[11] *Id.* at 733.
[12] A126 (Tr. 27:1-3).

As to the first objection, the State's comment referred specifically to prior testimony. We have held that "[p]rosecutors may refer to statements or testimony as a 'lie' . . . only if the 'prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie.'"[13] The record supports the trial court's conclusion that the prosecutor was referring to prior testimony regarding a Jamaican sign of music appreciation known as "bigging up a song." Multiple witnesses testified that, in Jamaican reggae culture, pointing two fingers in the air and saying "blau, blau, blau" is a sign of appreciation for a song. However, during testimony, Spence stated that the gesture was used as a threat. The prosecutor's statement, which Spence objected to, referred specifically to that testimony, and was not a general or sweeping comment that Spence was lying. Therefore, we agree with the trial court that the statement failed to rise to the level of prosecutorial misconduct.

The second objection concerns Slide 067. The slide displayed a picture of Williams's body, splayed and bloodied, and read "Christopher Spence's actions led to . . . Terror . . . Fear . . . And to the ultimate crime . . . MURDER[.]"[14] The word "MURDER" appeared in large, red lettering. The picture used was an exhibit, which had been properly admitted into evidence during the trial. The slide was the last of the presentation and contained the photograph of the victim, displayed for the third time. On appeal, Spence contends that "[t]he State's additional commentary and improper visual aids unfairly ignited the 'flames of passion' immediately prior to jury deliberations."

---

[13] *Warren v. State*, 774 A.2d 246, 256 (Del. 2001) (quoting *Hughes*, 437 A.2d at 571)).
[14] A210.

8

As to Slide 067, the trial court stated that, "[w]hether this conduct amounted to prosecutorial misconduct at all is questionable."[15] In fact, it appeared that the trial court was prepared to provide, if one had been requested, a curative instruction.[16] But rather than make an explicit finding, the trial court determined that, "regardless of whether this conduct does in fact amount to misconduct, in order to determine whether reversal is warranted the remaining two steps of harmless error must be applied."[17] It then found that any error was harmless. While a specific finding as to prosecutorial misconduct may not have been necessary in view of the remainder of the trial court's analysis, we address this point specifically in order to provide guidance to the Bar, as the use of PowerPoint presentations and their acceptable boundaries in criminal prosecutions present issues of first impression in Delaware. Because this is a novel issue in this State, we have examined recent decisions from our sister courts across the country.

The Supreme Court of Washington has addressed similar issues in two recent opinions. First, in *In re Glasmann*,[18] the Supreme Court of Washington determined that the word "GUILTY," displayed in red font across the booking photograph of the defendant, was an impermissible appeal to the jury's emotions. It granted a new trial because the prosecution's slideshow presentation contained multiple assertions of the defendant's guilt, statements that the jurors could only acquit the defendant if they

---

[15] *State v. Spence*, 2014 WL 2089506, at *5 (Del. Super. May 15, 2014).
[16] A128 (Tr. 35:7-18).
[17] *Spence*, 2014 WL 2089506, at *5.
[18] 286 P.3d 673 (Wash. 2012).

believed the defendant's trial testimony, and improperly modified exhibits.[19]  In addition,

the court found the misconduct to be so pervasive that it could not have been cured by an

instruction.

Second, and more recently, in *State v. Walker*,[20] the Supreme Court of Washington

reversed a defendant's conviction and remanded for a new trial based on prosecutorial

misconduct where the prosecution "committed egregious misconduct in its closing

PowerPoint presentation[.]"[21]  There, the court found that the prosecution's slideshow

was improper because

> it included multiple exhibits that were altered with inflammatory captions
> and superimposed text; it suggested to the jury that [the defendant] should

[19] Spence also relies on *State v. Rivera*, a Superior Court of New Jersey case we find to be readily distinguishable.  99 A.3d 847 (N.J. App. Div. 2014).  There, the court reversed the defendant's convictions on the basis of the "cumulative impact of the prosecutor's misconduct." *Id.* at 865.  The prosecutor, in *Rivera*, "declared [the defendant] guilty" twice. *Id.* at 854-55.  In so declaring during its opening statement, the prosecution showed a PowerPoint, which "contain[ed] a photograph showing [the] defendant's face and neck, which [was] displayed with a bright red border.  It also include[d] text, printed in the same color and density, 'Defendant *GUILTY OF:* ATTEMPTED MURDER.'  The words 'Defendant' and '*GUILTY OF:*' appear[ed] on separate lines to the right of [the] defendant's photograph, and 'ATTEMPTED MURDER' appear[ed] below the photograph in much larger typeface." *Id.* at 854 (emphasis in original).  In reversing the defendant's convictions, the *Rivera* court recognized that New Jersey's Supreme Court "has consistently condemned conduct that invades the exclusive province of the jury to resolve factual disputes, assess credibility and decide whether the State's evidence establishes guilt." *Id.* at 856 (citations omitted).  Further, the court suggested that "[i]t is difficult to conclude that a prosecutor's declaration of the defendant's guilt before the first witness is sworn would not have invaded the province of the jurors." *Id.*  Finally, the *Rivera* prosecutor used the PowerPoint presentation in summations and "included statements about the law of self-defense that were so oversimplified as to be misleading." *Id.* at 864.  Four of the prosecution's final five slides employed oversimplified summaries of the law of self-defense. *Id.* at 864-65.  The court concluded that, despite the judge's instructions to the jury, "the sheer quantity and variety of highly prejudicial remarks, visual displays and a courtroom antic, give us reason to have serious doubt about the jurors' capacity to follow those instructions." *Id.* at 865 (citations omitted).  Because the prosecutor's conduct here does not approach the degree of repetition in *Rivera*, we find the instant matter to be distinguishable.

[20] 341 P.3d 976 (Wash. 2015), *cert. denied*, 135 S. Ct. 2844 (2015).

[21] *Id.* at 985.

be convicted *because* he is a callous and greedy person who spent the robbery proceeds on video games and lobster; it plainly juxtaposed photographs of the victim with photographs of [the defendant] and his family, some altered with racially inflammatory text; and it repeatedly and emphatically expressed a personal opinion on [the defendant's] guilt.[22]

The PowerPoint was approximately 250 slides in length, with over 100 such slides containing the heading "DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER." The court also noted that two slides had the heading "DEFENDANT WALKER GUILTY OF ASSAULT IN THE FIRST DEGREE," and three had the heading "DEFENDANT WALKER GUILTY OF SOLICITATION TO COMMIT ROBBERY." Additionally, the PowerPoint included the words "GUILTY BEYOND A REASONABLE DOUBT" over the defendant's booking photo. The lettering was bright red.

The Supreme Court of Washington observed that "[c]losing argument provides an opportunity to draw the jury's attention to the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case, to present derogatory depictions of the defendant, or to express personal opinions on the defendant's guilt."[23] It found the State's misconduct to be so flagrant, pervasive, and prejudicial that it could not have been overcome with a timely objection and an instruction to the jury to disregard the improper slides.[24]

---

[22] *Id.* at 985.

[23] *Id.* (citation omitted).

[24] *Id.* The court noted that "[t]he voluminous number of slides depicting statements of the prosecutor's belief as to [the] defendant's guilt, shown to the jury just before it was excused for deliberations, is presumptively prejudicial and may in fact be difficult to overcome, even with an instruction." *Id.* at 986.

11

In *Lopez-Bonilla v. State*,[25] the Supreme Court of Nevada reviewed a trial court's judgment of conviction and considered a defendant's argument that "the State committed prosecutorial misconduct during rebuttal closing argument by briefly displaying photographs of him and the co[-]defendant with the word 'guilty' across the front."[26] Notably, the trial court disallowed a PowerPoint presentation offered by the defendant "because it found some of the presentation to be extremely inflammatory, prejudicial, inappropriate, and biased."[27]  Nonetheless, the trial court allowed the prosecution to display the marked photographs.  Lopez-Bonilla's co-defendant objected to the photographs, "conceding that their limited use was proper but objecting to any prolonged display, and the [trial] court sustained the objection" when the photographs were shown for a second time.[28]  The Supreme Court of Nevada upheld Lopez-Bonilla's conviction, providing:  "even assuming error, we conclude that [the defendant] fail[ed] to establish that [the photographs] affected his substantial rights."[29]

A different result was obtained in the Supreme Court of Nevada in *Watters v. State*,[30] where the prosecution, during its opening statement, utilized a PowerPoint slide showing the defendant's booking photograph with the word "GUILTY" displayed "across his battered face."[31]  While the offending slide was displayed to the jury, the prosecutor stated:  "So after hearing the evidence in the case, we're going to ask you to

---

[25] 2015 WL 1797303 (Nev. Apr. 15, 2015).
[26] *Id.* at *2.
[27] *Id.* at *1.
[28] *Id.* at *2.
[29] *Id.* (citations omitted).
[30] 313 P.3d 243 (Nev. 2013).
[31] *Id.* at 245.

find the [d]efendant *guilty* on possession of stolen vehicle, *guilty* on grand larceny auto, *and guilty* on failure to stop on a police officer's signal."[32]  In reversing and remanding for a new trial, the Supreme Court of Nevada rejected the State's harmless error argument, which was based upon the fact that "the PowerPoint was not admitted into evidence; the jury was instructed on the presumption of innocence at the beginning and end of trial; the slides were displayed only briefly; and the evidence of [the defendant's] guilt was overwhelming."[33]  In rejecting the State's argument, the Supreme Court of Nevada held that, "in the presumption-of-innocence context, '[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined,' and the [United States] Supreme Court 'has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny.'"[34]

In *State v. Kalmio*,[35] the Supreme Court of North Dakota declined to reverse a defendant's conviction on the grounds that the State engaged in prosecutorial misconduct by displaying slides with "images of a gun and red circles" that were not in evidence and which the defendant "claimed resembled blood."[36]  The trial court sustained the defendant's objections to the slides and instructed "the jury to disregard the images."[37]  Further, the trial judge directed the jury "that any comments or statements by counsel concerning the evidence which are not supported by the evidence should be disregarded

---

[32] *Id.* at 246 (emphasis in original).
[33] *Id.* at 248.
[34] *Id.* at 248-49 (quoting *Estelle v. Williams*, 425 U.S. 501, 504 (1976)).
[35] 846 N.W.2d 752 (N.D. 2014).
[36] *Id.* at 766.
[37] *Id.*

and the jury member[s] should rely on their own recollection or observation."[38]   In affirming the trial court's judgment, the Supreme Court of North Dakota held that "the prosecutor's attempt to use two images during closing argument was not sufficiently prejudicial to violate [the defendant's] due process rights because the [trial] court directed the images to be removed and the jury to disregard the images."[39]

These cases demonstrate that the question of whether slideshow presentations rise to the level of prosecutorial misconduct is a highly-contextualized and fact-specific analysis.[40]  As a general matter, PowerPoint presentations are not inherently good or bad. Rather, their content and application determines their propriety.  This Court does not seek to discourage the use of technology in closing arguments to summarize and highlight relevant evidence for the benefit of the jury.  But slides may not be used to put forward impermissible evidence or make improper arguments before the jury.  A PowerPoint may not be used to make an argument visually that could not be made orally.   While prosecutors are given latitude in making closing arguments, his or her comments must be limited to properly admitted evidence and any reasonable inferences or conclusions that can be drawn therefrom.  The prosecutor may neither misstate the law nor express his or

---

[38] *Id.* at 767 (citation omitted).

[39] *Id.*

[40] It would be, no doubt, perilous for this Court to attempt to derive specific rules regarding visual aids.  For example, use of the color red is not always prejudicial.  Use of capitalized letters does not necessarily constitute "shouting."  The word "guilty," when presented as a written word in a visual aid, does not always constitute an improper expression of a prosecutor's opinion of guilt.

her personal opinion on the merits of the case or the credibility of witnesses.[41]  A defendant should timely object to improper comments or slideshow presentations, so that the trial court is offered an opportunity to address any objections.

In the instant matter, we conclude that the prosecutor's use of Slide 067 was improper and that the display of Williams's bloody body with the words "Terror," "Fear," and "MURDER" in red lettering served no purpose other than to attempt to inflame the jury.  Closing arguments are an opportunity for counsel to argue reasonable inferences drawn from the evidence.  While the prosecutor is entitled to focus the jury's attention on admitted evidence, a slide that achieves no end but to inflame the passions of the jury is improper.  This conclusion flows from the recognition that prosecutors represent the people of the State and must act impartially in the pursuit of justice.  Fanning the flames of a jury's collective emotions through the use of improper PowerPoint slides to obtain a conviction does not serve the interests of justice.[42]

---

[41] *See generally* Kyle C. Reeves, *PowerPoint in Court:  The Devil's Own Device, or a Potent Prosecution Tool?*, 48 PROSECUTOR 26, 28-29 (2014) ("An informal survey of cases reported in all 50 states found that 37 states . . . have appellate decisions in criminal cases that mention the use of PowerPoint by the prosecutor at some phase of trial—almost always in conjunction with a defendant's claim of prosecutorial misconduct. . . .  Of the 37 states where the reported cases mention PowerPoint, seven states  . . . have reported one or more criminal cases being reversed because of prosecutorial misconduct involving the use of PowerPoint.") (citations omitted).

[42] *See Bennett v. State*, 164 A.2d 442, 446 (Del. 1960) ("A prosecuting attorney represents all the people, including the defendant who [is] being tried.  It is his [or her] duty to see that the State's case is presented with earnestness and vigor, but it is equally his [or her] duty to see that justice be done by giving [the] defendant a fair and impartial trial."); *Mitchell v. State*, 2014 WL 1202953, at *6 (Del. Mar. 21, 2014) (same); *Miller v. State*, 893 A.2d 937, 951 n.51 (Del. 2006) (same, and also noting that "prosecutors must resist the urge to win at all costs" (citation omitted) (internal quotation omitted)); *Taylor v. State*, 827 A.2d 24, 27 (Del. 2003) (quoting *Bennett*, 164 A.2d at 446)  (referencing the prosecutor's "dual obligation to present the State's case 'with earnestness and vigor' while discharging 'his duty to see that justice be done by giving defendant a fair and impartial trial'"); *Price v. State*, 858 A.2d 930, 941 (Del. 2004) ("A

15

The third objection raised at trial was with respect to statements which Spence argued undermined the dangerousness of the Sure Shots gang. At times during summation, the State asserted that Sure Shots was a violent gang, and, in its PowerPoint, stated that Spence could only recall two incidents involving the Sure Shots besides the so-called Palmer Murder. The State argued that, even though the gang was violent, Spence had knowledge of only a few violent incidents involving the Sure Shots, and none of the incidents involved the victims in the instant matter, and, thus, it was unlikely that Spence subjectively believed his life was in danger when he shot Williams and Allen.

Based on the record, we agree with the trial court that the State maintained that the Sure Shots was a dangerous gang. The statements, both in the PowerPoint presentation and during the State's closing, describe the Sure Shots as such. Because Spence's subjective belief as to the danger he found at the time of the shooting was the focus of his defense, we agree with the trial court that these statements did not amount to prosecutorial misconduct.

### B. *Hughes* Test: Timely Objections

The second step in the harmless error review is to apply the three-pronged *Hughes* test, where we must consider (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.[43]

---

prosecutor is simultaneously both an officer of this Court and an officer of this State; the direct report of a duly elected Attorney General."); *Hunter*, 815 A.2d at 735 (explaining that prosecutors "must 'seek justice, not merely convictions'") (citation omitted).

[43] *Hughes*, 437 A.2d at 571 (quoting *Dyson*, 418 A.2d at 132).

16

Although Slide 067 was improper, we agree that the slide does not require reversal of Spence's conviction under the *Hughes* test.

As to the closeness of the case, this case was not close. Spence admitted to the intentional killing of Williams and the attempted killing of Allen. Although Spence relied on the justification defenses of self-defense and defense of others, he could not satisfy the requirements of the defenses, even under his own version of the events. Under 11 *Del. C.* § 464(c), the use of deadly force is justifiable if the defendant believes that such force is necessary to protect himself from death or serious physical injury. However, the use of deadly force is not justifiable if "[t]he defendant knows that the necessity of using deadly force can be avoided with complete safety by retreating . . . ."[44] Likewise, as to the defense of others, "[w]hen the person whom the defendant seeks to protect would have been obliged under [11 *Del. C.*] § 464 . . . to retreat, . . . the defendant is obliged to try to cause the person to do so before using force in the person's protection if the actor knows that complete safety can be secured in that way."[45] Therefore, the person claiming self-defense must retreat if he—or the person he seeks to protect—can do so safely.

At trial, Spence testified that he had the opportunity to leave safely before he approached the victims with the shotgun, as well as after he began to fire. While at oral argument, Spence's counsel argued that, at the precise time of the shooting by the elevator, Spence did not have an opportunity to retreat. According to Spence's own

---

[44] 11 *Del. C.* § 464(e)(2).
[45] 11 *Del. C.* § 465(c).

17

recollection of the events at trial, however, Spence had multiple opportunities to retreat. Further, Spence continued to fire after the first shot, when he had another opportunity to retreat. In his testimony, he described how he continued to pump the shotgun and fire multiple times after the first shot:

Q. And that gun you were using was a pump action shotgun?

A. Yes.

Q. That means after you fired the first time, you had to pull the gun back and jam it forward to get another shell into that chamber?

A. Yes.

Q. Didn't automatically feed?

A.  No.

Q. So when you fired, you had to move the action, move it up, fire again?

A. Yes.

Q. Move the action, move it up?

A. Yes.

Q. Fire again?

A. Yes.

In addition, Spence testified that he left the party at one point and chose to return despite the presence of the Sure Shots. During the trial, Spence also stated that, although he could have called the police, he chose not to because the police would "break the party up."

Self-defense is also unavailable if the defendant, "with the purpose of causing death or serious physical injury, provoked the use of force against the defendant in the same encounter . . . ."[46] Here, it was Spence, with shotgun in hand, who approached the two victims. According to Spence, it was only after his approach that he observed, in his view, Williams reaching for his waist. Therefore, the justification defense would also not be available based on Spence's provocation. As Spence's own testimony negated the applicability of self-defense and there were no other defenses offered, the case before the jury was not close on the issue of justification.

Moreover, the State produced additional evidence during the trial, including testimony from a number of witnesses present during the party, eyewitnesses to the shooting, and the testimony of Allen. The State also provided forensic testimony, physical evidence, and Spence's prior statements to the police. Ultimately, the jury took less than six hours to convict Spence on all the indicted charges. Therefore, this factor, "the closeness of the case," weighs heavily in favor of harmless error.

The second factor is "the centrality of the issue affected by the error." The issue at trial was whether Spence had a meritorious justification defense. Slide 067 depicts the victim of the homicide but does not speak to the issue of justification.

With respect to the third factor, "the steps taken to mitigate the effects of the error," the jury instructions addressed the personal opinions or beliefs of the attorneys. Further, the defense rejected the trial court's offer of a curative instruction at the time of its objection to Slide 067.

---

[46] 11 *Del. C.* § 464(e)(1).

Considering all three factors, we conclude that the alleged prosecutorial misconduct, which was objected to in a timely manner, did not amount to more than harmless error under the *Hughes* test. The first factor, the closeness of the case, is particularly compelling. Accordingly, a mistrial was not required under *Hughes*.

### C. Plain Error Review of Untimely Objections

"Where defense counsel fails to raise a timely and pertinent objection to alleged prosecutorial misconduct at trial and the trial judge does not intervene *sua sponte*, we review only for plain error."[47] In plain error review, we first examine the record *de novo* to determine whether prosecutorial misconduct occurred, a process reflective of the procedure followed in connection with harmless error review. If we determine that no misconduct occurred, our analysis ends there.[48] If, however, the prosecutor did engage in misconduct, we move to the second step in the plain error analysis by applying the *Wainwright* standard.[49]

Under the *Wainwright* standard, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process" (the "*Wainwright* test").[50] Further, "the doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial

---

[47] *Baker*, 906 A.2d at 150 (citations omitted).
[48] *Id.*
[49] *Id.*
[50] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citing *Dutton v. State*, 452 A.2d 127, 146 (Del. 1982)).

20

right, or which clearly show manifest injustice."[51]   If we find plain error under *Wainwright*, we must reverse without reaching the third step of the analysis.

"As with the harmless error analysis, if we conclude that the misconduct would not warrant reversal under the *Wainwright* standard, we proceed to apply *Hunter* as the third analytical step and consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process."[52] Under the *Hunter* analysis, we can reverse, "even if the prosecutorial misconduct would not warrant reversal under the *Wainwright* standard."[53]

Spence identifies three instances of alleged prosecutorial misconduct that he did not object to during the proceedings below, namely:  (1) the State, during its slideshow, impermissibly characterized the victims as "helpless;" (2) the State misstated the law of the justification defenses of self-defense and defense of others in its PowerPoint presentation; and (3) the State included the statement "[t]he defendant is guilty of all the charges against him" in its slideshow.  The trial court found, in each instance, that the prosecutor's statements did not amount to prosecutorial misconduct.

### 1.   The PowerPoint's Characterization of the Victims

We reject Spence's contention that the State's characterization of the victims as "helpless" in its PowerPoint presentation was misconduct and an impermissible appeal to the jury's emotions.  The slides in question included the following statements:  "Intent can be formed in an instant…like when walking over top of a helpless person and

---

[51] *Baker*, 906 A.2d at 150 (quoting *Wainwright*, 504 A.2d at 1100).
[52] *Id.* (emphasis removed).
[53] *Id.*

shooting them as they lay helpless" and "[s]hot him as he lay helpless on the floor[.]" Spence argues that the State could have used another word, such as "unarmed," which would not have packed an emotional punch. We agree with the trial court that it would have made little difference, in terms of emotional appeal to the jury, if the State had substituted the term "unarmed" for the word "helpless." When viewing the statements as a whole, saying that a defendant shot an "unarmed" victim versus saying that a defendant shot a "helpless" victim is a question of semantics. The terms "unarmed" and "helpless" are substantially similar in effect—to be unarmed during the shooting at the elevator was to be helpless.

Further, it was reasonable for the State to draw the inference, based on the facts, evidence, and testimony presented, that Williams and Allen, at the time of the attack, were helpless to defend themselves. According to Spence's testimony, the victims were waiting for the elevator at the time of the shooting. Although Spence testified that he perceived Williams "reaching for his waist" after Spence had approached with the shotgun, he admitted that he never observed Williams or Allen with a gun. In fact, no gun was found on Williams's body, nor was there any testimony or evidence presented suggesting that either victim was armed. Thus, based on the evidence before this Court, the State could logically infer that Williams and Allen were "helpless" at the time of the shooting. Accordingly, we agree with the trial court's conclusion that these statements were not improper appeals to the jury's emotions amounting to prosecutorial misconduct.

**2. The PowerPoint's Statement of the Law of Self-Defense**

22

Spence also untimely objected to four slides that, he contends, misstate the law regarding the justification defenses. Spence objected to slides, which stated: "They (i.e. SureShots) + Might (i.e. what could happen) ≠ *Self Defense*[.]" Spence also objected to slide 059, which appeared as follows:

> *Self Defense*
> ➢ Immediately necessary to protect against the unlawful use of force
> ➢ To protect against death or serious physical injury
> ➢ When you are the aggressor
>
> *and*
>
> ➢ You assume they might have a gun
> **There is no Self Defense**[54]

Spence further objected to slide 060, which largely mirrored slide 059, but substitutes "There is no Defense of Others" for "There is no Self Defense[.]"[55]

Spence contends that these slides misstated the law because knowledge that someone "might" be armed, coupled with movements toward his waist, could reasonably support a subjective belief that the person was in imminent physical harm. Therefore, he argues that the fact that he did not know for certain whether the victims were armed did not preclude a justification defense. The State argued that the PowerPoint slides were only demonstrative aids and must be taken in conjunction with the comments that accompanied each slide. We agree that the slides were improper, as they misstate the law of self-defense.

---

[54] A201 (emphasis in original). The last line, "There is no Self Defense," appeared in enlarged text.

[55] A201-02. The last line, "There is no Defense of Others," appeared in enlarged text.

23

While a portion of the State's oral presentations focused on Spence's subjective belief, the inaccurate slides created the potential for confusion.[56] That is, the slides do not properly represent the substance of 11 *Del. C.* § 464 to the jury. 11 *Del. C.* § 464(b) provides, in part, that "a person employing protective force may estimate the necessity thereof under the circumstances as the person believes them to be when the force is used, without retreating, surrendering possession, doing any other act which the person has no legal duty to do or abstaining from any lawful action."[57] Further, 11 *Del. C.* § 464(c) sets forth: "The use of deadly force is justifiable under this section if the defendant believes that such force is necessary to protect the defendant against death, serious physical injury, kidnapping or sexual intercourse compelled by force or threat."[58] In that regard, the slides are inaccurate and improper.

### 3. The PowerPoint's Assertion that the Defendant is Guilty

Spence's third untimely objection was to slide 066, which includes the following statement: "***The defendant is guilty of all the charges against him***[.]"[59] Spence argues that this statement constituted improper vouching, as it was a personal expression

---

[56] During closing arguments, the prosecutor paraphrased the trial court's instructions to the jury with respect to the defendant's subjective belief, stating that "self-defense is when you use the immediate use of force to protect yourself or others and you use deadly force when you think you are going to be killed or seriously injured, and that has to be reasonable." The prosecutor further stated that "if someone is using self-defense, it is justifiable when that force is immediately necessary for the purpose of protecting himself." The prosecutor also argued to the jury: ". . . you've heard about the Sure Shots and them and how dangerous they were. If you think that was something the defendant was considering, but if that was not reasonable, if he thought because the Sure Shots are bad, I've got to kill these guys, and that thought is not based on a sound reason, then self-defense doesn't apply to those offenses which have a reckless mindset."

[57] 11 *Del. C.* § 464(b).

[58] 11 *Del. C.* § 464(c).

[59] A153 (emphasis in original). In the slideshow, the relevant typeface was enlarged.

24

attributable to the State concerning Spence's guilt. "Conceptually, improper vouching occurs when the prosecutor implies personal superior knowledge, beyond what is logically inferred from the evidence at trial."[60] In *Kirkley v. State*, we addressed the issue of improper vouching regarding the following statement made during closing arguments: "The State of Delaware is bringing this charge because it is exactly what [the defendant] did."[61] This Court found that "[a]sserting that the State brought the charges because [the defendant] committed the crime implies personal knowledge outside the evidence and emasculates the constitutionally guaranteed presumption of innocence."[62]

We agree that the statement contained in slide 066 was improper. While the State asserts that the statement appeared at the end of a series of slides in which it set forth its arguments for each offense, the State should have included a qualifier before its statement, such as, for example, "the evidence demonstrates."

### D. *Wainwright* Test: Untimely Objections

Although we disagree with the trial court's conclusions as to two of the objections in our plain error review, we agree that the statements and slides at issue do not rise to the level of plain error under the *Wainwright* test. As noted, under the standard, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the

---

[60] *Kirkley*, 41 A.3d at 377 (citing *White v. State*, 816 A.2d 776, 779 (Del. 2003); *Flonnory v. State*, 893 A.2d 507, 539 (Del. 2006) ("It is well-settled that prosecutors may not express their personal opinions or beliefs about the credibility of witnesses or about the truth of any testimony.")).
[61] *Id.* at 375.
[62] *Id.* at 378.

25

fairness and integrity of the trial process."[63] Here, the conduct at issue was not so prejudicial to substantial rights that the fairness and integrity of the trial process was jeopardized. As explained above with regard to Spence's timely objections, this was not a close case. We have previously suggested that a "plain error is more likely to be found in the improper vouching context where witness credibility is central in a 'close case,' and where the error is so egregious that the trial judge should have intervened *sua sponte* to correct it."[64] Accordingly, we conclude that the alleged misconduct which Spence failed to timely object to does not satisfy the *Wainwright* standard.

As to the misstatement of the law of self-defense, the trial court did instruct the jury accurately.[65] The trial court explained that "[t]he Delaware code defines, in relevant part, this defense as follows: The use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting the defendant against the use of unlawful force by the other person on the present occasion."[66] The trial court also instructed that "[t]he use of deadly force is justifiable if the defendant believes that the -- believes that such force is necessary to protect the defendant against death or serious physical injury."[67] There were no objections to the instructions with respect to the law of self-defense.

---

[63] *Wainwright*, 504 A.2d at 1100 (citing *Dutton*, 452 A.2d at 146).
[64] *Whittle v. State*, 77 A.3d 239, 248 (Del. 2013) (citing *Clayton v. State*, 765 A.2d 940, 944 (Del. 2001)).
[65] B289-90 (Tr. 107:1-112:3).
[66] *Compare* B289 (Tr. 107:13-19) *with* 11 *Del. C.* § 464(a).
[67] *Compare* B289 (Tr. 108:4-7) *with* 11 *Del. C.* § 464(c). The trial court continued, instructing the jury:

26

Further, as to the use of force to protect another, the trial court instructed the jury that "[t]his defense is available only if all -- is available only if all three of the following conditions are met: One, Mr. Spence would have been justified in using such force to protect himself against the unlawful force that he believed to be threatened against the person Mr. Spence sought to protect; and, two, Mr. Spence believed that under the circumstances, the person he sought to protect would have been justified in using such protective force; and, three, Mr. Spence believed that the intervention was necessary for the protection of the other person."[68] The trial court continued: "You may find Mr. Spence guilty only if you're satisfied beyond a reasonable doubt that Mr. Spence did not believe that the force he used was immediately necessary to protect others then and there from unlawful force used by the other person."[69] Although the self-defense slides were

---

You may find Mr. Spence guilty only if you are satisfied beyond a reasonable doubt that Mr. Spence did not believe that the force -- that the force he used was immediately necessary to protect himself then and there from unlawful force used by another person -- by the other person. If you find that Mr. Spence believed that the use of deadly force upon Mr. Williams and Mr. Allen was necessary to protect himself against death or serious physical injury but that he was reckless in having such belief, which was material to justify the use of deadly force, self-defense is unavailable for the offenses of murder in the second degree, manslaughter-reckless causation of death, and reckless endangering in the first degree.

B289 (Tr. 108:19-109:11).
[68] B289 (Tr. 109:20-110:8).
[69] B290 (Tr. 111:6-11). The trial court also instructed the jury as follows: "If you find that Mr. Spence believed that the use of deadly force upon Mr. Williams and Mr. Allen was necessary to protect others against death or serious physical injury but that he was reckless in having such belief, which was material to justify the use of deadly force, the defense of use of force to protect others is unavailable for the offenses of murder second degree, manslaughter-reckless causation of death and reckless endangering in the first degree." B290 (Tr. 111:12-21).

27

improper, the trial court's instructions were accurate. We conclude that the error did not jeopardize the fairness and integrity of the trial.

### E.    The *Hunter* Test

The final step of both harmless and plain error review is to apply the *Hunter* test to any instances of prosecutorial misconduct, regardless of whether the conduct passed the *Hughes* test or the *Wainwright* test. The *Hunter* test, as noted, considers "whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process."[70] Here, of Spence's alleged six instances of prejudicial misconduct, three of these can be considered prosecutorial misconduct: Slide 067, the slide that provides "[t]he defendant is guilty of all the charges against him[,]" and the slides describing the justification defenses. But, even when viewed together, these statements did not cast doubt on the integrity of the judicial process, particularly in light of the substantial amount of evidence presented in the case against Spence, including his own testimony. The trial court's instructions were proper and there were no objections to them. Therefore, this Court finds that reversal is not warranted under the *Hunter* test.

### V.    CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is **AFFIRMED**.

---

[70] *Hunter*, 815 A.2d at 733.