IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JERMAINE BOOKER, | § | |
| | § | |
| Defendant Below- | § | No. 231, 2016 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID 1409017638 (N) |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: April 21, 2017
Decided: July 14, 2017

Before **STRINE**, Chief Justice; **VALIHURA** and **SEITZ**, Justices.

# **O R D E R**

This 14th day of July 2017, upon consideration of the parties' briefs[1] and the record on appeal, it appears to the Court that:

(1)   In January 2016, a Superior Court jury convicted the defendant-appellant, Jermaine Booker, of Assault in the First Degree (as a lesser included offense to Attempted Murder in the First Degree), Home Invasion, Burglary in the Second Degree, Robbery in the First Degree, Theft, and Possession of a Deadly Weapon During the Commission of a Felony.  The Superior Court sentenced him to

---

[1] After the opening brief on appeal was filed September 21, 2016, the State requested transcription of additional parts of the trial record.  After the additional transcript was filed, a new brief schedule was issued and the appellant filed an amended opening brief on January 4, 2017.  The State filed its answering brief on February 15, 2017.  The appellant did not file a reply.

serve forty-four years in prison. Booker was represented by counsel at trial. On appeal, he requested and was permitted to waive his right to appellate counsel. This is Booker's *pro se* direct appeal.

(2) The charges against Booker stemmed from two separate incidents on November 21, 2013 and January 2, 2014, respectively, occurring at neighboring homes in the Windsor Hills development in Wilmington. The first homeowner, Drew Van Dyk, testified at trial that his home was burglarized on November 21, 2013. Stolen from his home were two bicycles, multiple electronic items, prescription drugs, keys to his 1998 Subaru and a 1997 driver's manual for the car,[2] and an old New Jersey license plate that had been on his grandmother's car. When he reported the burglary to the police, Van Dyk told officers that, two days before the burglary, a young black man came to his home asking if he needed any yard work done. The young man was carrying a dark backpack and said his name was Enoch, which is Booker's middle name. Van Dyk gave the young man $10 and a ride to a nearby bus stop.

(3) The owners of the second burglarized home, John Warfield and Jacqueline Fiore, also testified at trial. Warfield testified that he left home on the morning of January 2, 2014 to attend an 8:00 a.m. training session for a new computer that he bought at Christmas. His wife, who was still sleeping at home

---

[2] Police later found this manual on January 2, 2014 at the second crime scene.

when he left, was scheduled to attend a separate session for her new computer later that afternoon. When he returned home around 9:30 a.m., his garage door was open and his wife's Lexus was gone. There were other items also missing from the garage, including a leaf blower and gas can. He entered the house and found his wife on the first floor of their home beaten unconscious and bloody. He called 911.

(4) A paramedic and a forensic nurse both testified at trial. The paramedic testified that, upon arriving at the scene, Ms. Fiore was a trauma code, meaning that her injuries were life threatening. She was unconscious and her airway was obstructed by blood. Upon her arrival at the hospital emergency room, the forensic nurse took photographs and documented Ms. Fiore's injuries, which included several incise wounds to her face and head caused by a sharp object. She had bruising, abrasions, and lacerations all over her body, multiple rib fractures, multiple face fractures, a collapsed lung, injuries to her eye, and swelling of her brain. Ms. Fiore remained in the hospital for several weeks.

(5) Jacqueline Fiore testified that she had no memory of January 2, 2014. Before that morning, she had been an active retiree who traveled, volunteered, exercised regularly, and had a black belt in karate. As a result of the assault, she spent several weeks in the hospital, undergoing multiple surgeries including a craniotomy due to swelling in her brain, and several more months in rehabilitation facilities. She lost one eye and was left blind in the other. She suffers left-side

3

paralysis due to a stroke caused by the beating. She now requires a full-time aide to help her with activities of daily life, and she remains in significant pain.

(6) The State's evidence also fairly established that, on January 2, 2014, Booker took his then-pregnant girlfriend to Red Lobster on Concord Pike to celebrate her birthday. He told her that he was going to drive to New Jersey to see his cousin, Kendall Briscoe. On January 4, 2014, Booker drove to Briscoe's home in Newark, New Jersey. EZ-Pass records reflected the precise times that the transponder associated with Fiore's Lexus entered and exited the New Jersey Turnpike on January 4, 2014. Briscoe's girlfriend testified that Booker arrived at her home in New Jersey on the afternoon of January 4. Although she did not see Briscoe exit or enter a car, she did notice an unfamiliar Lexus parked in front of her home. She also saw Booker and Briscoe walking toward the Lexus as she was leaving her house, but she did not see if they got into the car.

(7) Later on January 4, 2014, a police officer from Newark, New Jersey saw the Lexus spin out in the snow. She saw the two occupants of the Lexus, Booker and Briscoe, get out of the car and walk away, leaving the car parked next to a fire hydrant. The New Jersey license plate on the vehicle was not registered. When the officer stopped Booker and Briscoe to question them about the car, Briscoe gave non-responsive answers to her questions, and then the two men ran away. Additional police officers gave chase and ultimately found the pair hiding under another car.

4

Both men were arrested and charged with resisting arrest and receiving stolen property.

(8)     New Jersey police discovered that not only was the Lexus stolen but it was associated with the assault in Delaware.  The car was towed back to Delaware shortly thereafter.  It was later discovered that the expired license plate on the Lexus was the one stolen from Drew Van Dyk's garage.  Forensic testing recovered Booker's fingerprints on the back of the stolen license plate.  Other items found in the stolen Lexus included a leaf blower, gas can, a black backpack with male clothes, a positive pregnancy test,[3] a steak knife, a box cutter, and green Nike sneakers with Ms. Fiore's blood on them.  Booker's father testified that the shoes resembled the pair that he had given Booker for Christmas.  Neither Booker's fingerprints nor his DNA were recovered from the interior of the car or from any of the objects found inside the car.

(9)     After the State rested its case, Booker's counsel moved for a judgment of acquittal on the charges of home invasion and second degree burglary as well as the weapon charge.  The Superior Court denied the motion.  Booker did not testify or present any other evidence in his own defense at trial.  The jury found Booker not

---

[3] Booker's girlfriend testified that Booker had asked her if he could keep her positive pregnancy test as a souvenir.

5

guilty of attempted murder, but guilty of the lesser included offense of first degree assault and all of the remaining charges. This appeal followed.

(10) Booker raises eight issues in his *pro se* opening brief on appeal. First, he alleges a denial of his constitutional right to a speedy trial. Second, he contends that the State committed a *Brady*[4] violation when it failed to timely supply the underlying data supporting its experts' conclusions. Third, he contends that the evidence was insufficient to convict him. Fourth, he contends that the Superior Court erred in admitting expert testimony regarding blood spatter. Fifth, he contends that his trial counsel was ineffective in failing to cross-examine the two victims about their exculpatory out-of-court identifications. Sixth, he contends that his trial counsel was ineffective for failing to subpoena witnesses in support of an alibi defense. Seventh, he asserts that the trial judge abused his discretion and imposed a sentence that constitutes cruel and unusual punishment. Finally, he contends that the prosecutor made multiple improper comments during his closing argument. We address these claims in order.

(11) Booker's first claim on appeal is that the Superior Court erred in denying his motion to dismiss the indictment for the State's violation of his right to a speedy trial. We review *de novo* the alleged denial of a constitutional right.[5] In

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).
[5] *Service v. State*, 2015 WL 1234489, *2 (Del. Mar. 17, 2015).

6

order to determine whether a defendant's speedy trial rights were violated, a court assesses four factors: a) the length of the delay; b) the reason for the delay; c) the defendant's assertion of the right; and d) prejudice to the defendant.[6] Unless the delay is lengthy enough to be presumptively prejudicial, there is no need to inquire into the remaining factors.[7] There is no precise length of time that will trigger a speedy trial analysis in every case because longer periods of delay may be excusable in serious and complex cases.[8]

(12) This was a serious and complex case. It involved the commission of multiple serious felonies at multiple crime scenes and required the collection and extensive forensic testing of a large quantity of evidence. The case also required the cooperation of New Jersey authorities. Although Booker asserts that the two-year delay between his January 2014 arrest and his January 2016 trial was prejudicial, the factual underpinning of his argument is incorrect. His January 2014 arrest is not the proper starting point for analyzing the length of the delay in this case because his arrest in January 2014 was for violating New Jersey law in a different, albeit related, case. He was not indicted, arrested, and returned to Delaware to face charges for the Windsor Hills crimes until September 2, 2014.[9] Thus, the total elapsed time between

---

[6] *Barker v. Wingo*, 407 U.S. 514, 530 (1972).
[7] *Middlebrook v. State*, 802 A.2d 268, 273-74 (Del. 2002).
[8] *Skinner v. State*, 575 A.2d 1108, 1116 (Del. 1990).
[9] *See Middlebrook v. State*, 802 A.2d at 273 (holding that the right to a speedy trial attaches at the date of arrest or indictment, whichever comes first).

7

Booker's indictment and his trial was about sixteen months. Given the complexities of this case, we do not find that delay to be presumptively prejudicial under the specific circumstances presented here. Thus, we find no merit to Booker's argument and do not address any of the remaining factors in the speedy trial analysis.[10]

(13) Booker next argues that the State committed a *Brady* violation when it failed to timely disclose the underlying data for the expert's DNA analysis. In *Brady v. Maryland,* the United States Supreme Court held that the prosecution must disclose to the defense evidence favorable to the defendant.[11] There are three elements to a *Brady* violation: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State; and prejudice must have ensued."[12] In this case, Booker does not dispute that the State provided the information requested before trial and that the Superior Court gave the defense almost four months to review it and consult with its own expert. Under the circumstances, we find no *Brady* violation because there was no suppression and no prejudice.

(14) Next, Booker contends that the evidence was insufficient to prove that he was the perpetrator of these crimes. In reviewing a sufficiency of the evidence claim, the Court must determine, after viewing the evidence in the light most

---

[10] *Id.* at 273-74.
[11] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).
[12] *Norman v. State*, 968 A.2d 27, 30 (Del. 2009).

favorable to the prosecution, whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt.[13] The State can meet its burden of proof through direct or circumstantial evidence.[14] In-court identification or eyewitness testimony is not required to prove identity.[15] Rather, the test to establish identity is whether a rational jury, viewing the evidence and all reasonable inferences drawn from the evidence, could conclude beyond a reasonable doubt that the defendant committed the crimes charged.[16]

(15) In this case, although neither victim was able to positively identify Booker as the perpetrator, there was more than sufficient circumstantial evidence to prove that Booker committed the crimes against both victims. Items stolen during the Van Dyk burglary, including the Subaru manual later found at Ms. Fiore's home and the expired New Jersey license plate found on Ms. Fiore's stolen Lexus, inextricably linked the two crimes. Videotape footage captured images of Booker and his girlfriend in North Wilmington on January 2, 2014, despite Booker's statement to the police that he was not in Delaware that day. Booker's girlfriend testified that Booker told her at dinner that evening that he was intending to go to Newark, New Jersey to see his cousin Kendall Briscoe. Booker had asked his

---

[13] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).
[14] *Vincent v. State*, 996 A.2d 777, 779 (Del. 2010).
[15] *McDonald v. State*, 2016 WL 4699155 (Del. Sept. 7, 2016).
[16] *Vincent v. State*, 996 A.2d at 779.

pregnant girlfriend if he could keep her pregnancy test as a souvenir. Two days later, Booker and Briscoe were arrested in Newark, New Jersey after abandoning Ms. Fiore's stolen Lexus and fleeing from police. Among the items found in the stolen vehicle were a leaf blower and gas can from the Fiore home, a pair of sneakers with Ms. Fiore's blood on them, as well as a backpack containing a positive pregnancy test. Booker's fingerprints were recovered from the stolen license plate on the stolen car. Moreover, Booker's father testified that the bloody sneakers resembled a pair that he had recently given Booker for Christmas and an empty shoebox for the same model of shoe was recovered at Booker's home. Under the circumstances, we conclude that the State's evidence, though circumstantial, was sufficient to prove beyond a reasonable doubt that Booker was the perpetrator of these crimes.[17]

(16) Booker next contends that the Superior Court erred in admitting testimony from the State's blood spatter expert. At trial, defense counsel objected to the witness' qualifications to testify as an expert. On appeal, however, Booker only challenges the relevancy and reliability of the witness' testimony, which opined that the spots of blood on the toe of the sneaker were spatter stains that were consistent with the sneaker being in close proximity to the event that caused Ms. Fiore's blood to become airborne and spatter. The witness also opined that blood within the tread of the sneaker was consistent with the sneaker coming into contact

---

[17] *See Styler v. State*, 417 A.2d 948, 950 (Del. 1980).

with a surface already wet with Ms. Fiore's blood and that the blood-soaked carpet at the crime scene had sufficient characteristics that would have allowed the blood to deposit in the tread. Booker challenges this testimony on appeal because the witness could not testify with any degree of statistical certainty about how the blood actually got on the sneakers.

(17) To admit an expert's testimony, the trial judge must comply with Delaware Rule of Evidence 702, which provides, in part, that a qualified expert witness may testify to assist the jury in understanding the facts if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[18] The "rule does not require that the conclusions derived from those principles and methods be scientifically valid."[19] Booker's belated challenge to the validity of the expert's conclusions go to the arguable weight to be afforded the testimony and not to its admissibility.[20] Under the circumstances we find no merit to Booker's claim.

---

[18] *See* Del. Unif. R. Evid. 702.
[19] *McNally v. State*, 980 A.2d 364, 370 (Del. 2009).
[20] *Griffith v. State*, 2003 WL 1987915, *3 (Del. Apr. 28, 2003).

(18)   Booker's next two arguments assert claims that his trial counsel was ineffective.  This Court will not consider such claims for the first time on direct appeal.[21]

(19)   Booker next contends that his sentence is excessive and constitutes cruel and unusual punishment.  Booker contends that the judge imposed a sentence far outside SENTAC's presumptive range and failed to address the substantial mitigating factors, including his good character, his lack of a stable upbringing, his lack of a prior criminal record, and his educational pursuits.  Booker also contends that the judge was unusually cruel by requiring him to spend every January 2 for the first twenty years of his sentence in solitary confinement.

(20)   This Court's review of a sentence is generally limited to whether the sentence exceeds statutory limits.[22]  The maximum sentence that the Superior Court could have imposed in this case was 109 years.  The judge found substantial aggravating factors, including excessive cruelty, lack of remorse, vulnerability of the victim, and undue depreciation of the offense.  Contrary to Booker's suggestion, the record reflects that the judge considered the presentence investigation report, which he described as "one of the biggest" he had ever seen.  The judge considered defense counsel's arguments in mitigation, as well as Booker's allocution, before

---

[21] *Johnson v. State*, 962 A.2d 233, 234 (Del. 2008).
[22] *Mayes v. State*, 604 A.2d 839, 842-43 (Del. 1992)

imposing a sentence that was less than half of the maximum sentence. Under these circumstances, we find no record support for Booker's claim that the judge sentenced him with a closed mind.[23]

(21) Booker's final contention on appeal is that the prosecutor engaged in multiple instances of misconduct during the closing argument, including: (i) showing a PowerPoint slide with Booker's photo and the word "guilty" written on it; (ii) implying that Briscoe was protecting Booker; (iii) stating that Booker had time to sell the items stolen from the burglarized homes; (iv) stating that Booker did not leave for New Jersey sooner because of the weather; (v) stating that Booker tried to kill Ms. Fiore; (vi) stating that Booker's middle name, Enoch, is not a common name; (vii) stating that Booker was Ms. Fiore's "Goliath;" (viii) stating that it was "clear as day" that Booker robbed Ms. Fiore; (ix) stating that Booker was the only one who knew what happened and implying that Booker had contacted Briscoe a week before trial; (x) offering his personal opinion that Booker was guilty when he suggested that Booker stole the car based on the belongings found in the car; and (xi) stating that Booker's motive was to get out of town.

(22) Booker did not raise any of these objections at trial. Thus, we review for plain error only.[24] Plain error exists when the error complained of is apparent on

---

[23] *Weston v. State*, 832 A.2d 742, 746 (Del. 2003).
[24] Del. Supr. Ct. R. 8.

13

the face of the record and is so prejudicial to a defendant's substantial rights as to jeopardize the integrity and fairness of the trial.[25]  The burden of persuasion is on the defendant to show prejudice.[26]

(23)  As to Booker's argument about the PowerPoint slide, there is no evidence of that slide in the record.  In its answering brief, the State seems to concede that the prosecutor used such a visual aid, but that the slide also included the words "DNA," "Prison Calls," "Witness Testimony," and "Fingerprints" and was not shown until the conclusion of the State's closing when the prosecutor asked the jury to consider all of the evidence pointing to Booker's guilt.  The State asserts that this visual aid was not improper because it was the equivalent of the prosecutor stating, "The evidence shows that Booker is guilty."

(24)  As this Court has recently noted, the question of whether a slideshow presentation rises to the level of prosecutorial misconduct is a "highly-contextualized and fact-specific analysis."[27]  Booker failed to raise a timely objection to the slide and, thus, deprived the trial court of the opportunity to rule on the propriety of the slide in the context of the entire closing.  The slide is not evidence and, because there was no objection to it, the slide did not become part of the record on appeal.  As important, when read in its full context, the slide presentation was not

---

[25] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[26] *Brown v. State*, 897 A.2d 748, 753 (Del. 2006).
[27] *Spence v. State*, 129 A.3d 212, 223 (Del. 2015).

inflammatory but walked the jury through the evidence presented by the State that, in the view of the state, proved that Booker was guilty. Although the use of the single word "GUILTY" as the conclusion was perhaps not ideal, it was, considered in context, linked to the prior recitation, which was tied to the record and showed the chain of evidence that the State contended supported conviction. Under these circumstances, we cannot conclude that Booker sustained his burden of establishing plain error.

(25)  Moreover, we find no plain error as to Booker's other ten alleged instances of prosecutorial misconduct during closing arguments. We find that all of the statements challenged by Booker were either misstatements, were taken out of proper context, or were simply statements of the evidence or reasonable inferences to be drawn from the evidence.[28]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:
/s/ Leo E. Strine, Jr.
Chief Justice

---

[28] *Czech v. State*, 945 A.2d 1088, 1099 (Del. 2008).

15