## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 0907019543A |
| | ) | |
| LEONARD M. TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: March 20, 2016
Decided:  April 26, 2016

On Defendant Leonard Taylor's Second Amended Motion for
Postconviction Relief.
**DENIED.**

# <u>ORDER</u>

Elizabeth R. McFarlan, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware, Attorney for Defendant.

COOCH, R.J.

This 26th day of April, 2016, upon consideration of Defendant's Second Amended Motion for Postconviction Relief, it appears to the Court that[1]:

>      1.     On May 4, 2009, a body was found in a wooded
>             area in Carney[s] Point, New Jersey, shot three
>             times in the head. The victim had trash bags over
>             his  head  and  legs  and  did  not  have  any

---

[1] Unless otherwise indicated, all of the facts in this case are quoted verbatim from Defendant's direct appeal to the Delaware Supreme Court. *Taylor v. State*, 44 A.3d 923, 2012 WL 1377589, at* 1–4 (Del. Apr. 17, 2012) (TABLE) (internal citations omitted).

identification on his person when he was discovered. The victim was later identified by fingerprints as Sven Hinds ("Hinds").

2.    In late January 2009, Hinds along with two associates, Dharrion Newton ("Newton") and [Ricardo] Rimpal [("Rimpal")], migrated from the State of New York to the Delaware area to pursue a clothing line and t-shirt business. The t-shirt business was primarily a front for the real purpose of illegal narcotic sales. The fourth member of this drug sales operation was Taylor, who provided clientele for the drug operation as well as access to heroin, while Hinds had several contacts for cocaine. The "business" was conducted in both the State of Delaware and the State of Maryland.

3.    The four business associates spent a great deal of time in different hotels in the Newark area, from which they were able to both create and sell t-shirts along with engage in the sale of narcotics. The police were able to determine that Taylor had rented several vehicles from American Auto Rental, which was located in Edgewood, Maryland. Specifically, from April 7, 2009[,] through May 5, 2009, Taylor had rented a 2006 Toyota Avalon. The rented Avalon was equipped with a GPS unit which had a daily self-check device that allowed the business owner of the vehicle to be able to locate the vehicle on a daily basis. On May 2, 2009[,] and May 3, 2009, the 2006 Avalon was located at a shopping center in Newark, Delaware. Located next to that shopping center was a Super Eight Motel at 268 East Main Street, Newark, Delaware.

4.    Business records from the Super Eight Motel revealed that Taylor had rented two rooms at the motel from April 17, 2009[,] through May 6, 2009, specifically rooms 219 and 115. The Newark Police Department executed a search warrant on Room 219, where several blood stains were found on the carpet and the carpet padding in the center of the room. A DNA analysis was completed on the blood sample contained in the carpet from Room 219, and was matched to Hinds, the victim.

5. Throughout the investigation, which included several police agencies in three different states, there was no physical evidence to identify who murdered Hinds. The murder weapon was never located, there was no DNA evidence that identified the perpetrator or perpetrators, and there was no identifying fingerprint evidence to link to the individual or individuals who murdered Hinds.

6. Believing that the murder was not random or committed in the course of a robbery, the police theorized that the murder was committed by someone who knew and associated with Hinds and had a motive to commit the murder. The police were ready to focus their investigation on identifying a person who met those criteria.

7. As a result, the investigation focused on interviewing Hinds' business associates as well as other people who spent time with Hinds' business associates. Newton and Rimpal were both interviewed several times and each gave several contradictory versions to the police as to what occurred on the evening of May 2, 2009, and who was involved. Newton and Rimpal both lied to the police numerous times in their statements to law enforcement and routinely explained that the basis for their lies was fear of retaliation from Taylor and or Hinds and their associates and families. However, the one feature common to all of their respective statements prior to trial was that Taylor was the person in Room 219 on May 2, 2009, and that when they (Rimpal and Newton) arrived in the room that evening, Hinds was lying dead on the floor.

8. The trial began on January 10, 2011. One of the State's key witnesses was Rimpal, who testified that on the night of the murder, he received a phone call from Taylor asking for Rimpal to purchase a few items from Wal–Mart. Those items included latex gloves, peroxide, and a container/storage bin, and were all commonly used as part of the t-shirt business. Rimpal was with Sheena Testerman ("Testerman") at the time of the phone call and trip to Wal–Mart. She testified consistently with Rimpal regarding the products purchased at Wal–Mart.

3

Rimpal testified that he drove from the Wal–Mart to the Super Eight motel with Testerman. As they exited the vehicle, Testerman went to the first floor motel room and Rimpal proceeded upstairs. Rimpal testified as he entered the upstairs motel room, Newton and Taylor were in the room and he did not see Hinds. However, as he entered the room he saw Hinds' feet between the two beds on the floor. Rimpal testified that he saw a small pistol tucked in Taylor's waistband and then later saw Hinds with a gunshot in his temple.

9.     During his testimony, Rimpal acknowledged that in prior interviews with law enforcement he was not truthful and also minimized his involvement in the murder of Hinds. He explained the basis for his actions was that he was afraid of the repercussions from back where he lived. Rimpal further testified before the jury, over objection by Taylor's trial counsel, that the basis for his fear was that he had been assaulted on a couple of occasions, insinuating Taylor had something to do with these assaults. Trial counsel for Taylor objected at sidebar and asked for a mistrial due to the clear implication, made by Rimpal, that Rimpal was assaulted three times and Taylor had something to do with it. The trial judge denied the motion for mistrial and instead gave the jury a curative instruction.

10.    Rimpal also provided the State with information regarding motive. Rimpal testified that Taylor and Hinds dealt with each other and often engaged in mutual childish "hazing." Rimpal also testified that Hinds ordered him to do nasty things to Taylor's mother. In furtherance of Rimpal's desire to create a motive for the State, he testified how he informed Taylor of Hind's instructions regarding threatening Taylor's mother and destroying Taylor's father's property. Rimpal also told the jury that Taylor was aware that Hinds did not like him and Taylor was putting up a front and dealing with it. Rimpal was not arrested or charged for anything in connection with the murder of Hinds.

11.    Newton testified for the State regarding his recollection of what occurred the evening of Hinds'

murder. Newton testified, consistent with Rimpal, that they both entered the room separately, that Taylor was in the motel room with a pistol, and Hinds was on the floor. Newton also testified that he and Rimpal, along with Taylor, all cleaned up the room where Hinds was murdered, and that they all placed trash bags on Hinds body and transported the body to New Jersey where it was dumped in a wooded area.

12.    Newton acknowledged that throughout his time in Delaware and Maryland he smoked a great deal of marijuana. Newton also testified that in prior interviews with law enforcement he was not truthful and also minimized his involvement in the murder of Hinds. The basis for his actions, he explained, was that he was afraid of the repercussions from back where he lived, because there was a motto, "snitches get stitches." For that reason, he was worried for the sake of himself and his family. As a result of the numerous lies and false statements to the police, Newton was charged with hindering prosecution in February 2010. Newton pled guilty to that felony[-]level offense. His sentencing was scheduled for the month after Taylor's trial, in February 2011.

13.    Eric Briggs was a prison snitch who testified to statements made by Taylor while both were incarcerated in Harford County, Maryland. On January 19, 2011, before Briggs testified, Taylor's counsel filed a Motion to Exclude Taylor's statements to Briggs. After hearing oral arguments on the [M]otion prior to Briggs' testimony, the trial judge denied Taylor's Motion to Exclude.

14.    Briggs testified that Taylor told him that Taylor shot the victim three times in the head and then drove the body and dumped it in the woods in New Jersey. Briggs also claimed that Taylor told him that the victim was planning on taking over his drug business and had threatened harm to Taylor's mother. Briggs corroborated several facts concerning Taylor's drug operation, which Newton and Rimpal previously testified to. In his testimony, Briggs confirmed that in his July 20,

5

> 2009 interview he was told by law enforcement to find out more detailed incriminating statements from Taylor. Briggs also testified that the purpose of gaining more detailed statements from Taylor was to then report back to the police with the hope of receiving a "break."

15. Defendant was convicted of non-capital Murder First Degree and Possession of a Firearm During the Commission of a Felony. Defendant filed a *pro se* "Motion of Acquittal" on February 8, 2011.[2] Defendant's trial counsel moved to withdraw the following week.[3] Trial counsel's Motion to Withdraw was granted on March 30, 2011, and the Court appointed conflict counsel to represent Defendant in his appeal to the Supreme Court.[4] On June 2, 2011, Defendant was sentenced to life imprisonment, plus five years for Possession of a Firearm During the Commission of a Felony.[5] A timely notice of appeal was filed with the Delaware Supreme Court.[6] Defendant's conviction and sentence were affirmed on April 17, 2012.[7]

16. On April 29, 2013, Defendant filed a *pro se* Motion for Postconviction Relief.[8] This Court appointed counsel to represent Defendant. Appointed counsel then filed an Amended Motion for Postconviction Relief, asserting ineffective assistance of both trial and appellate counsel. In October 2014 both trial and appellate counsel submitted separate affidavits in response to the claims of ineffective assistance of counsel. Defendant then filed a Second Amended Motion for Postconviction Relief, reflecting newly-provided record evidence of a PowerPoint slide that had been used by the

---

[2] A7.
[3] *Id.*
[4] *Id.*
[5] A53–56.
[6] A8.
[7] *Taylor v. State*, 44 A.3d 923, 2012 WL 1377589, at* 1 (Del. Apr. 17, 2012) (holding the Superior Court acted within its discretion in giving a curative jury instruction rather than granting a mistrial for a witness's statement that he had been assaulted by Defendant and the State's use of a cellmate to gather information about the murder did not violate the due process clause of the Delaware Constitution).
[8] A10.

State in its summation, the State filed a Response. Defendant elected not to file a reply to the State's Response.

17. Defendant's Amended Motion is controlled by Superior Court Criminal Rule 61.[9] Before addressing the merits of this Amended Motion, the Court must address the procedural requirements.[10]

18. A motion for postconviction relief can be procedurally barred for time limitations, successive motions, procedural defaults, and former adjudications.[11] If a procedural bar exists, the Court will not consider the merits of the postconviction claim unless the Defendant can show that, pursuant to Rule 61(d)(2), the procedural bars are inapplicable.

19. None of these procedural bars apply to Defendant's Second Amended Motion. Although a claim for relief that is not asserted in the proceedings leading up to judgment of conviction is procedurally barred, Defendant alleges ineffective assistance of both his trial and appellate counsel, which he could not have brought until now.

20. Defendant's claim of ineffective assistance of counsel is reviewed under the United States Supreme Court decision in *Strickland v. Washington*.[12] To determine whether a defendant was denied his Sixth Amendment right to effective assistance of counsel, *Strickland* established a two-prong test.[13] First, a defendant must show that counsel's performance was deficient because the representation fell below an objective standard of reasonableness.[14] Second, the defendant must then show he

---

[9] Super. Ct. Crim. R. 61. Since Defendant filed his Motion for Postconviction Relief on April 29, 2013, Defendant's Motion is governed by the version of Rule 61 that became effective on July 1, 2005, and not the current version of the Rule.

[10] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[11] Super. Ct. Crim. R. 61(i)(1)-(4).

[12] 466 U.S. 668 (1984).

[13] *Ploof*, 75 A.3d at 820 ("While the Sixth Amendment is not directly applicable to the State of Delaware, the United States Supreme Court has applied the Sixth Amendment to the states through the Fourteenth Amendment.").

[14] *Strickland*, 466 U.S. at 687-88.

was prejudiced by the deficient performance.[15] "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[16]

21. When evaluating whether counsel's representation fell below an objective standard of reasonableness, a court must "eliminate the 'distorting effects of hindsight' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"[17] Also, to establish prejudice a defendant must show "a reasonable probability that[] but for counsel's unprofessional errors, the result of the proceeding would have been different."[18] "A reasonable probability is a probability sufficient to undermine confidence in the outcome," which is a lower standard than "more likely than not."[19] Finally, when reviewing trial counsel's performance under *Strickland*, there is "a strong presumption that the representation was professionally reasonable."[20]

22. Defendant raises four claims for relief in his Second Amended Motion. His first assertion is that trial counsel was ineffective because he allegedly failed to advise the State that Defendant was willing to plead "no contest" to the charge of manslaughter. Defendant acknowledges that the State offered him a plea agreement to the charge of manslaughter, but with that offer he would have had to plead "guilty."[21] Defendant claims that he asked his trial counsel if he could plead "no contest," and trial counsel told him that was not possible without consulting the State.[22] Defendant claims that "[t]rial counsel did not even know [Defendant's] plea options, because he never discussed [Defendant's] no contest plea proposal with the State."[23] Finally, Defendant claims that this deficient performance by trial counsel prejudiced him, because if he was able to secure a

---

[15] *Id.* at 687.
[16] *Id.*
[17] *Ploof*, 75 A.3d at 821 (quoting *Strickland*, 466 U.S. at 689).
[18] *Strickland*, 466 U.S. at 694.
[19] *Id.* at 693-94.
[20] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).
[21] Second Amended Mot. for Postconviction Relief at 27 (Jan. 30, 2016).
[22] *Id.*
[23] *Id.* at 28.

8

no contest plea to manslaughter, "his sentence would have been vastly less, even at its maximum, than the one he is currently serving."[24]

23. However, in the affidavit of trial counsel Eugene J. Maurer, Esquire it seems clear that Defendant was made aware of his plea options and neither suffered ineffective assistance of counsel nor any prejudice at the hands of his counsel. In trial counsel's affidavit he states, "[Defendant] was brought to the courthouse in Dover on November 17, 2010[,] for the sole purpose of what counsel believed was going to be an acceptance of the plea that had been extended by the State."[25] After Defendant ultimately rejected the proposed plea offer, trial counsel sent a letter to Defendant the following day memorializing the previous day's events. Trial counsel therein stated:

> Through my efforts I was able to persuade the prosecution to extend a [p]lea [o]ffer to you which would have resulted in your being incarcerated for a period of five years in connection with a plea to Manslaughter. As part of the plea, the State would drop [the] charges of Murder in the First and Second Degrees and Possession of a Firearm During the Commission of a Felony. The State would have recommended 25 years in jail, suspended after five years for six months Home Confinement followed by 18 months at Level III Probation. You initially indicated to me that you were unwilling to accept the plea due to the fact that you were not given any guarantees or assurances that the bargained-for sentence would be that which would be imposed. You did, however, indicate quite clearly to me that if I could provide you with those assurances, you would in fact accept the State's [p]lea [o]ffer.
>
> Acting upon that, I went back to the Prosecutor's Office and spoke with them and, specifically, was able to have them agree to an immediate sentencing which, for the most part,

---

[24] *Id.* at 29.

[25] Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief at ¶ 6. D.I. 87.

9

would have precluded any additional sentence above and beyond that which was negotiated. Even more so, I met with the Judge on November 17 in the presence of the Prosecutors and went over the terms of the [p]lea [a]greement with him. He indicated that, as long as the State was in agreement with the recommendation, which they were, he would follow the negotiated plea resolution. I also indicated to you that I've been practicing in front of this Judge and in Dover for quite some period of time, and I have never seen the Judge or the Court disregard a [p]lea [a]greement of this nature.

I, therefore, came back to you after the [Truth in Sentencing] documents were signed and indicated the above to you and told you that the five-year sentence was a guarantee. For reasons which are bewildering to me, you then indicated that you did not "trust the system" and, in particular, you were concerned by the fact that the parents of the victim were present and wanted to speak in memory of their son, who was assassinated by three bullets in his head, and I further indicated to you that their presence would not make a difference in the terms of the sentence that was [going to be] imposed. In short, I told you without hesitation that the five-year prison sentence was a "done deal" and that the Judge would impose it. Of course, you would have been given credit for time served and also you would be able to obtain "good time" during the period of time when you were incarcerated. We figured that you would be out of prison in approximately two and one-half years. I must say that this is probably the best plea that I have ever been able to negotiate for an individual charged with Murder in the First Degree. Notwithstanding the above, as is our right, you rejected the plea and now wish to go to trial. . . .

Please understand something[:] You are never required to accept any type of [p]lea [o]ffer and you certainly have the right to go to trial no matter how good the offer is. What bothers me is that fact that you allowed me to go forward and do all of these things on your behalf when it now appears that you never had any intention of accepting such a plea in the first place. If you had simply told me flat out that you did not wish to do

10

that, then I would not have gone to all the trouble that I did to try to make the five-year plea a reality for you. In that sense, and for reasons which are not at all clear to me, it appears that you were manipulating me toward your own ends and for reasons which, again, are entirely unclear to me. . . .

I simply wanted to put all of these things "on the record," if you will, so, if things don't go well for you at trial, I am quite sure that I will be the first one at whom you point a finger for not having represented your interests adequately. I wanted to make clear that you were provided with every opportunity to accept the plea which would have eliminated the potential of a mandatory life sentence and that you knowingly and intelligently rejected that [p]lea [o]ffer.[26]

24.    Given the letter trial counsel sent to Defendant the day after he rejected any plea offer from the State, it does not appear that trial counsel acted ineffectively, nor does it appear that Defendant suffered any prejudice due to trial counsel's actions. Contrary to Defendant's assertion that if he had been offered a "no contest" plea that "there is no reason to believe that he would not have accepted the offer," it appears that he likely still would have rejected it. Defendant was originally charged with Murder First Degree, which would require him to serve a mandatory life sentence. When offered the option to plead guilty to manslaughter and have the State cap its recommendation at five years Level V, he first agreed to accept the offer. Then, for reasons that were "bewildering" to trial counsel, Defendant then changed his mind and refused to accept the State's favorable offer.

25.    Since Defendant originally went to the courthouse to accept a plea agreement from the State; signed the Truth-in-Sentencing Guilty Plea form; and allowed his trial counsel to extensively negotiation such a favorable plea agreement, his assertion that he likely would have plead no contest to the charges but would not have plead guilty is hardly credible. Therefore, Defendant's

---

[26] Letter attached to Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief D.I. 87.

11

assertion that his counsel was ineffective for failing to communicate with the State about his willingness to plead no contest does not meet the first prong under *Strickland*.

26.    Next, Defendant argues that the State's case against him was based primarily "around the testimony of several accomplices."[27]  Therefore, Defendant contends that trial counsel was ineffective for failing to request an accomplice testimony instruction and appellate counsel Brian J. Chapman, Esquire was ineffective for failing to raise that failure on appeal.  In 2010 the Delaware Supreme Court ruled that trial counsel was ineffective in *Smith v. State* because trial counsel failed to request an accomplice testimony instruction.[28]  The Court reasoned that trial counsel should have requested an accomplice testimony instruction because the normal pattern instruction on witness credibility and arguments to the jury about an accomplice's credibility were not enough to guard against the accomplice's possible ulterior motivation for testifying.[29]

27.    Defendant states that three of the witnesses who testified against him at trial testified to being both accomplices in drug dealing and accomplices to the murder of Hinds.  Defendant contends that this testimony was "central" to the State's case against him and provided details in the case that were not corroborated by other evidence.  Defendant states that "[m]ost of the other evidence corroborating the story that [Defendant] killed Hinds came from a prison snitch and a woman who first claimed to merely have 'assumed' [Defendant] was the murderer."[30]

28.    Defendant places great emphasis on the 2010 Delaware Supreme Court decision in *Smith v. State*.[31]  Although the Delaware Supreme Court has since overruled the holding in *Smith*, this Court must apply the case law that was controlling

---

[27] Second Amended Mot. for Postconviction Relief at 31 (Jan. 30, 2016).
[28] 991 A.2d 1169, 1175 (2010).
[29] *Id.* at 1177–78.
[30] Second Amended Mot. for Postconviction Relief at 36 (Jan. 30, 2016).
[31] 991 A.2d 1169 (Del. 2010) *overruled by Brooks v. State*, 40 A.3d 346 (Del. 2010).

12

at the time of the trial.[32] Defendant asserts that since the testimony was uncorroborated by other evidence and it was central to the State's case, trial counsel's failure to request accomplice testimony instruction constituted ineffective assistance of counsel. Furthermore, Defendant contends that his appellate counsel was ineffective for failing to raise this issue on appeal.

29. Trial counsel stated in his affidavit that "[i]t was not the defense's strategy to even suggest to the jury that Newton, Rimpal, and Testerman were accomplices to the homicide with which [Defendant] was charged."[33] Instead, it was "defense's position that [Defendant] was not involved in the acts giving rise to the homicide and was not guilty of the offenses."[34] During a prayer conference where the issue was raised, trial counsel advocated against any such instruction because it did not comport with his trial strategy. Trial counsel stated:

> Your Honor, I think, without citing the case law, obviously the Court is very familiar with it, that there has to be some evidence in the record to support the giving of the instruction. I think the State's theory of the case as presented to the jury is that [] Taylor committed this homicide and committed it alone and that Mr. Newton and Mr. Rimp[al] helped him after the fact.
>
> My argument would never be that [] Taylor was an accomplice to either Mr. Rimp[al] or Mr. Newton. I think I am free, based on the record, to argue that that Mr. Newton or Mr. Rimp[al] could have committed this homicide either themselves or together while maintaining that [] Taylor did not. So I don't believe that, under the case law, there's sufficient evidence in the record to support the

---

[32] *Hoskins v. State*, 102 A.3d 724, 732 (Del. 2014) ("Thus, for cases decided before *Brooks*, our analysis on postconviction review of a *Bland* claim is governed by the case law controlling at the time of the trial.").

[33] Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief at ¶ 8. D.I. 87.

[34] *Id.*

13

giving of an accomplice liability instruction. And I would object to such an instruction.[35]

30. The Court agreed with trial counsel's argument and found no rational basis in the evidence to support an accomplice testimony instruction. Since it was the defense strategy to separate Defendant from the witnesses and suggest that one or both of them actually killed Hinds, it does not make sense to then expect trial counsel to implicate Defendant as an accomplice to the murder with an accomplice jury instruction.

31. Furthermore, Defendant has failed to demonstrate that he suffered any prejudice. By arguing against an accomplice instruction, counsel was free to argue that the witnesses conspired against him, not with him, to commit the murder. Similarly, since trial counsel was not ineffective for not requesting an accomplice instruction, appellate counsel was not ineffective for not raising this claim on appeal.

32. The third claim raised by Defendant is that trial counsel was ineffective for failing to object to a PowerPoint slide donning his face and the word "Guilty" in bold, red letters. The slide also had the names of all of the witnesses and the word "Evidence" pointing at the photo of Defendant with red arrows.[36] Defendant contends that "[t]here is no reason to combine a visual of [him] with the word 'Guilty' embossed overtop in a PowerPoint slide except to stimulate emotion and prejudice."[37] Therefore, Defendant argues that his trial counsel was ineffective for failing to object to the slide and his appellate counsel was ineffective for failing to raise the claim on appeal.

33. A recent Delaware Supreme Court opinion discussed a similar situation and provided some guidance to the Bar on

---

[35] Tr. of prayer conference attached to Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief. D.I. 87.

[36] Defendant also states that the State used another slide that depicted Hinds' body with the word "Guilty" written over it during closings arguments. However, Defendant's counsel has been unable to find any record of this PowerPoint slide. Therefore, this Court will only consider the PowerPoint slide of which there is a record.

[37] Second Amended Mot. for Postconviction Relief at 42 (Jan. 30, 2016).

14

"PowerPoint presentations and their acceptable boundaries in criminal prosecutions."[38]   The Delaware Supreme Court stated:

> As a general matter, PowerPoint presentations are not inherently good or bad. Rather, their content and application determines their propriety. This Court does not seek to discourage the use of technology in closing arguments to summarize and highlight relevant evidence for the benefit of the jury. But slides may not be used to put forward impermissible evidence or make improper arguments before the jury. A PowerPoint may not be used to make an argument visually that could not be made orally. While prosecutors are given latitude in making closing arguments, his or her comments must be limited to properly admitted evidence and any reasonable inferences or conclusions that can be drawn therefrom. The prosecutor may neither misstate the law nor express his or her personal opinion on the merits of the case or the credibility of witnesses. A defendant should timely object to improper comments or slideshow presentations, so that the trial court is offered an opportunity to address any objections.[39]

34.  Trial counsel acknowledges that the best practice would have likely been to object to the use of the PowerPoint slide, as counsel was also the trial counsel in *Spence v. State*.[40] However, trial counsel states that his decision not to object "may" have been strategic.[41]  Appellate counsel also stated in his affidavit that he was not ineffective in his representation on

---

[38] *Spence v. State*, 129 A.3d 212, 220 (Del. 2015).

[39] *Id.* at 223 (internal citations omitted).

[40] Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief at ¶ 12. D.I. 87.

[41] *Id.* ("Counsel would note as an aside that he had objected once during [the State's] opening summation and twice during [the State's] rebuttal summation.  Counsel has always felt that repetitive objections during summations could redound to the defendant's detriment and that may be the reason why no additional objection was made to the [P]ower[P]oint.  The State's position that the defendant was guilty was fairly obvious. However, if given the opportunity again, counsel would have objected to this presentation.").

appeal because after a review of the transcripts and trial material, he raised the issues he felt had merit on appeal.[42]

35. The Court does not find that this slide was impermissible; therefore, trial counsel was not ineffective for failing to object and appellate counsel was not ineffective for failing to bring the issue on appeal. When evaluating individual PowerPoint slides to determine whether they are permissible, it is important to recognize what the Supreme Court stated in *Spence*:

> It would be, no doubt, perilous for this Court to attempt to derive specific rules regarding visual aids. For example, use of the color red is not always prejudicial. Use of capitalized letters does not necessarily constitute "shouting." The word "guilty," when presented as a written word in a visual aid, does not always constitute an improper expression of a prosecutor's opinion of guilt.[43]

The PowerPoint slide that was used in Defendant's trial is factually distinguishable from the impermissible slide used in *Spence*. The slide used by the State in *Spence* displayed an image of the victim's bloody body.[44] The slide also featured the words "Terror," "Fear," and "Murder."[45] By contrast, the slide used by the State in Defendant's trial displayed the word "Guilty" over an image of him. There is no blood and Defendant does not appear to be injured or unpresentable. It also contained the names of the witnesses and the word "Evidence" around Defendant's photograph, with arrows pointing towards Defendant. The implication seems to be that all of the witness' testimony and evidence lead to Defendant.

36. Unlike the impermissible slide in *Spence*, this slide was not meant to inflame the jury's emotions. Instead, the State was using the slide to visually illustrate what it was otherwise stating during its closing arguments: that Defendant was guilty of murdering Sven Hinds. In fact, Defendant's trial counsel has

---

[42] Appellate Counsel's Aff. In Resp. to Am. Mot. for Postconviction Relief at 3 (Oct. 27, 2014). D.I. 86.

[43] *Spence v. State*, 129 A.3d at 223 n. 40.

[44] *Id.* at 223.

[45] *Id.*

16

conceded in his affidavit and letter attached to the affidavit that it was "fairly obvious" that Defendant was guilty of the crime.[46] The letter that was attached to the affidavit was sent to Defendant on November 18, 2010, approximately three weeks before Defendant's trial.

37. The State's closing argument lasted approximately 90 minutes. During that time, the State discussed all of the evidence it presented during the case, including witness testimony. At the end of the State's closing, it declared, "Leonard Taylor is guilty of the murder of Sven Hinds. And when you look at the evidence, the State is confident that you will return a verdict of guilty against Leonard Taylor for the murder of Sven Hinds."[47] The slide that the State used visually depicted the conclusion the State was attempting to convey. The slide listed the witnesses that testified against Defendant and had red arrows that pointed towards a photograph of him indicating that he was guilty. There were no misstatements of law, no personal opinions given about witness credibility, and no impermissible evidence offered. Therefore, the slide was not impermissible and neither trial nor appellate counsel was ineffective for failing to challenge it.

38. Furthermore, even if the slide was improper, which the Court holds that it was not, trial counsel was not ineffective for failing to object under the *Hughes* test.[48] The three-prong analysis under *Hughes* considers: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the effects of the error.[49]

---

[46] *See* Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief at ¶ 12 ("The State's position that the defendant was guilty was fairly obvious."); Letter attached to Trial Counsel's Aff. In Connection with Pet'r's Mot. for Postconviction Relief ("[Y]ou seem[] to feel that your chances of winning this case at trial are better than I perceive[] them to be. . . . [T]here was a good chance that you could be convicted of Murder in the First Degree.").
[47] A329.
[48] *Hughes v. State*, 437 A.2d 559, 572 (Del. 1981) (quoting *Dyson v. U.S.*, 418 A.2d 127, 132 (D.C. 1980). *See also Spence*, 129 A.2d at 219 ("To determine whether the misconduct prejudicially affected the defendant, we apply the three factors identified in *Hughes v. State*.").
[49] *Hughes*, 437 at 572.

39. The first prong is easily met. Trial counsel advised Defendant several times that in trial counsel's opinion this was not a close case and it was "fairly obvious" Defendant was guilty of the crime. From the Court's review of the evidence, it also concludes that the State had a strong case. Second, this slide was not at the center of the State's case. The State presented five witnesses who testified against Defendant. The State then gave a closing statement that lasted 90 minutes. At the very end of the closing argument, the State displayed this slide. All that Defendant claims the State said was "Leonard Taylor is guilty of the murder of Sven Hinds. And when you look at the evidence, the State is confident that you will return a verdict of guilty against Leonard Taylor for the murder of Sven Hinds."[50] Therefore, the slide was not the centerpiece of the State's case, it was a visual summation of the evidence against Defendant. Finally, there does not appear to be any steps taken to mitigate the effects of the alleged error; however, given the strength of the first two factors, trial counsel's failure to object to the slide and appellate counsel's failure to raise the issue on appeal was harmless error, if error at all.

40. Last, Defendant claims that he is entitled to relief because of the cumulative prejudicial effect of the errors that he asserts in his Second Amended Motion. However, since Defendant has failed to demonstrate any prejudice from the alleged errors, there can be no cumulative effect.

Therefore, Defendant's Second Amended Motion for Postconviction Relief is **DENIED**.

**IT IS SO ORDERED.**

_____
Richard R. Cooch, R.J.

oc:   Prothonotary
cc:   Investigative Services

---

[50] A329.

18