# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | | |
|---|---|---|---|
| STATE OF DELAWARE, | ) | | |
| | ) | | |
| v. | ) | ID Nos. | 1601014934A |
| | ) | | 1601014934B |
| LAMOTT MATTHEWS, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## <u>MEMORANDUM OPINION</u>

Submitted: September 14, 2018
Decided: December 10, 2018

*Upon Consideration of Defendant's Motion for New Trial,*
**GRANTED**.

Eugene J. Maurer, Jr., Esquire, and Elise K. Wolpert, Esquire, of Eugene J. Maurer, Jr., P.A., of Wilmington, Delaware. *Attorneys for Defendant.*

Joseph S. Grubb, Esquire, and Zachary D. Rosen, Esquire, Deputy Attorneys General, of Department of Justice, of Wilmington, Delaware. *Attorneys for State.*

**MEDINILLA, J.**

## I. INTRODUCTION

On June 13, 2018, a jury returned guilty verdicts against Defendant Lamott Matthews on the charges of Murder First Degree and Possession of a Firearm During the Commission of a Felony ("PFDCF"). He timely moves this Court for a new trial under Superior Court Criminal Rule 33 and argues that the State's misrepresentations during closing arguments prejudiced and deprived him of his right to a fair trial.[1] For the reasons stated below, Defendant's Motion for New Trial is **GRANTED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

On June 5, 2018, this Court began a six-day jury trial in connection with the shooting death of William Brown that occurred on November 16, 2015 at the Gold Club ("Club") in Wilmington, Delaware. The State introduced evidence through seventeen (17) witnesses, including five (5) key individuals who were patrons and employees of the Club, present on the Sunday night—Monday morning in question. Mr. Brown, a regular at the Club, was fatally shot in a bathroom near the entrance of the Club following an altercation with the shooter.

---

[1] Defendant's Motion for New Trial at 2-10 [hereinafter Def.'s Mot.].

[2] The recitation of the facts is based on the evidence presented at the trial held on June 5, 2018 through June 12, 2018.

There was no dispute that Defendant had arrived at the Club earlier in the evening with two women. Both women testified that the three of them had traveled to a local bowling alley bar, consumed alcoholic beverages, and then went to the Club bar where they drank more into the early hours of November 16th. Also undisputed was that, during these early hours, a man was seen running into the Club shortly before a gun shot was heard, and out of the Club immediately after the shooting. The State argued that this man was the Defendant, who left the Club at some point before the shooting, and ran back in to shoot the victim.

There was no evidence of any prior dealings between the victim and Defendant. The State's theory, argued succinctly during its closing argument, was that "one shot was fired by a man driven by inexplicable anger and unjustified paranoia that was created out of thin air that evening…[because the Defendant thought the victim was] 'looking at him funny, eyeing him up weird,' and he didn't want to be soft."[3] The evidence to support what led Defendant to shoot the victim was therefore presented through a handful of witnesses who were working at or near the Club, as well as from individuals who were patronizing the Club that night.

The observations of the witnesses from that evening were critical to the State's case especially where there was no physical or forensic evidence connecting

---

[3] Def.'s Mot., Ex. D at 2:14-20.

Defendant to the murder. No weapon was introduced. No surveillance was presented of the inside of the Club. And although surveillance of an adjacent motel parking lot was introduced to suggest that Defendant was seen running into a vehicle with one of the women who testified that they were the individuals seen in the video, an employee of the motel offered a different description of the person(s) she saw and heard depicted on the same surveillance footage. Further, another witness, mentioned in greater detail below, testified that the man she saw running out of the Club immediately after the shooting jumped into a vehicle located on the Club's property, not the motel property.

The State's closing remarks at issue deserve a contextual framework. To prove identity—that the Defendant was the shooter or the same person who ran in and out of the Club—the State directed the jury to consider the collective vantage points of five witnesses in various locations of the Club.[4] In doing so, the State presented a diagram to the jury and outlined the location of the Club's three employees and two patrons at the time of the shooting, discussed their observations, and highlighted what they said at trial.[5]

---

[4] *See generally*, Def.'s Mot., Ex. D.

[5] *See generally id.*

4

One patron was Jennifer Sanchez, one of the women who was at the Club with the Defendant. Ms. Sanchez testified that Defendant made some form of a confession to the shooting. Yet, her recall was questionable. The State conceded that there were inconsistencies in her testimony due to either an unwillingness to get involved with the investigation or a lack of recall due to great amounts of alcohol consumption. The second patron was Hector Ocampo, the man in the bathroom and the only eyewitness to the shooting. Mr. Ocampo, a non-English speaker, also admitted through an interpreter that his recollection was limited due to having had consumed large quantities of alcohol that night. His description of the shooter did not match that of the Defendant. Therefore, the prosecutor argued that any inconsistencies of the patrons could be reconciled through highlighted portions of the testimony from the Club staff, most notably, Crystal Schneider, the bartender, and Natasha Chanelle, the person working the front door.

During trial, Ms. Chanelle was asked about her recall of two separate and distinct time periods. The first timeframe related to what she remembered about the person who entered the club with the two females earlier that Sunday. Then, she was asked about the individual she saw run in and out of the club hours later at the time of the shooting. As to the description of the man with the two women, she

described him as "[l]ight skinned, that's all I can remember."[6] She did not identify the Defendant.

Ms. Chanelle was then asked about the man she saw run in and out of the Club. She testified:

> A. Brandon and I were at the register doing a check on the register.... A gentleman ran into the club. We heard shots. The same gentleman ran out. And that's when me and Brandon went into the club and we found someone shot.
>
> Q. Are you able to describe the person that you're telling us ran out of the club?
>
> A. Besides what I just said, no.
>
> Q. But it would be the same description?
>
> A. Besides what I just said no. I can't - - I didn't see his face. I don't remember the face of the gentleman that came in. As I said, I work at the door, there's thousands of people that come through that door at any particular night. And I worked there seven days a week.
>
> Q. Right.
>
> A. The gentleman that ran out of the club, I described as - - that he's light skinned with a grey hoodie on. That's all I can say.
>
> Q. Did you see where the person that ran out of club that you just described went?
>
> A. To a red car parked by the sign.

---

[6] Def.'s Mot., Ex. A at 6:16-18.

Q. Do you remember anything else about the red car?

A. Just that it was parked by the sign.

Q. You mentioned a hoodie. Do you recall seeing anyone else in the club that was wearing a hoodie that evening?

A. A couple.[7]

On cross-examination, defense counsel asked several follow-up questions regarding whether the individual who entered the Club with the two women was the same individual that Ms. Chanelle saw run out of the Club after the shots, and referenced prior statements she had made to the Delaware State Police.[8] The cross-examination went as follows:

Q. And your statement then, which I think is the same today, you can't really say whether it was the same person; is that right?

A. Correct.

Q. And you also said, referring to page 3 of the statement at the very bottom, you were asked a specific question whether it was the same guy you saw run in and then run out?
And your answer was: That, I don't know.[9]

---

[7] Def.'s Mot., Ex. A at 10:12-11:19.

[8] *Id.* at 14:5-15:2.

[9] *Id.* at 14:12-20.

Defense counsel again referred to the statement she previously gave to the Delaware State Police to ask about the identity of the guy who ran in and out of the Club:

> Q. And then later on on page 4 of the statement that you gave later you were asked whether or not the rude guy, which is the one that came in initially that night, was the same guy that you saw run in and run out. And you said you couldn't say?
>
> A. I couldn't.
>
> Q. You couldn't say whether it was the same person or a different person; right?
>
> A. No.[10]

During the State's closing argument, the prosecutor stated: "Natasha Chanelle testified. She told us that as the defendant walks in the club...."[11] This statement triggered an immediate objection from defense counsel.[12] It was incorrect and the prosecutor offered to rephrase.[13] No further application was made by defense counsel. Then, further in its closing, the State discusses the importance of the

---

[10] Def.'s Mot., Ex. A at 20:2-10.

[11] Def.'s Mot., Ex. D at 9:22-10:1.

[12] *Id.* at 10:2-4.

[13] *Id.* at 10:6-7.

testimony of the bartender, Ms. Schneider, in conjunction with the front door staff, Ms. Chanelle:

> So, Crystal Schneider tells us...she sees [Defendant] leave. There was much questioning about what did she see, what she didn't see; that's up to you.... She says that she never saw the same guy who was with the girls...come back in. She says that.
>
> **But** *Natasha Chanelle tells us that, while she is at the front door, the guy that was with two girls comes running in past her.* And that got her attention. We then know that there was a loud bang. No one was quite sure that this was a gunshot at that time, but we know now that it was. And when the loud bang happens, we'll go back to Crystal. Crystal says she pops up as she's cleaning the floor from the drink. She says she pops up, she looks over and sees the same guy that threw the drink, the guy that was with the girls, running out of the bathroom. Then, we will go over to the main entrance where Natasha Chanelle says the same guy that ran in past her was the same guy that ran back past her to run out of the club and get into the red car.[14]

Defense Counsel objected again, and the Court conducted a sidebar discussion.[15] Defense counsel moved for a mistrial and argued that Ms. Chanelle did not identify the person that ran in and out of the club as the same guy that was with the two females earlier in the evening.[16]

---

[14] Def.'s Mot., Ex. D at 22:20-23:20 (emphasis added).

[15] *Id.* at 23:21-29:18.

[16] *Id.* at 26:5-9.

The prosecutor submitted that he had not misrepresented the evidence, and was merely arguing the evidence consistent with how Ms. Chanelle had testified.[17] This Court attempted to narrow the scope of the objection where the State maintained that the statement was proper and aligned with the evidence in this case. Unable to reconcile the respective positions of counsel, this Court denied Defendant's motion for mistrial and accepted the State's representation that it was arguing the evidence accurately.[18] Upon the request of defense counsel, this Court agreed to give an immediate curative instruction that closing arguments were not evidence and that it was the jury's recollection that controlled.[19]

On June 13, 2018, the jury returned verdicts against Defendant for Murder First Degree and PFDCF. On July 20, 2018, Defendant filed his Motion for New Trial.[20] The State filed its Response on August 20, 2018. Defendant filed a Reply on September 14, 2018.

---

[17] *Id.* at 25:7-26:19.

[18] Def.'s Mot., Ex. D at 28:7-12.

[19] *Id.* at 29:20-30:7.

[20] Defendant timely filed a Motion to Extend Time Within Which to File Motion for a New Trial, which this Court granted. The Court set a due date of July 20, 2018 for the Motion.

## III. PARTIES' CONTENTIONS

The State now concedes that, upon further review, the prosecutor's representation—that Ms. Chanelle told the jury that she identified the man running in and out of the Club as the same individual with the two women—was a "single unintentional mistaken statement."[21] The State suggests the error did not prejudice Defendant's substantial rights or his right to a fair trial,[22] and that the Court's curative instruction sufficed.[23]

Defendant maintains that the mistake amounts to prosecutorial misconduct and warrants a new trial.[24] He argues that where the issue of identity was critical, the statement was not only completely inconsistent with Ms. Chanelle's testimony, it also served to infect other, albeit accurate, statements made by the prosecutor during the State's closing argument.[25] The Defendant also argues that the statement was intentionally made as evidenced by the record where a seasoned prosecutor insisted he be permitted to argue what in hindsight the State realizes was not in

---

[21] State's Answer in Opposition to Defendant's Motion for New Trial ¶¶ 6,10 [hereinafter State's Opp.].

[22] State's Opp. ¶ 6.

[23] *Id.* ¶¶ 7-10.

[24] Def.'s Mot. at 2.

[25] *Id.* at 6-7.

evidence.[26] Finally, Defendant maintains he has suffered substantial prejudice regardless of whether the mistake was reckless and unintentional.[27]

## IV. STANDARD OF REVIEW

Defendant's timely motion is considered under Rule 33.[28] The court may grant a new trial "if required in the interest of justice."[29] A motion for a new trial is addressed to the sound discretion of the court.[30] The Court will consider prosecutorial misconduct claims differently if the party raised an objection to prosecutorial misconduct at trial or if the party did not raise a timely objection.[31] Here, defense counsel raised a timely objection at trial to warrant a harmless error review.[32]

Under harmless error review, the Court conducts a review of the "record to determine whether the prosecutor's actions were improper."[33] If the Court

---

[26] Reply in Support of Defendant's Motion for New Trial at 1 [hereinafter Def.'s Reply].

[27] *Id.* at 2.

[28] DEL. SUPER. CT. CRIM. R. 33.

[29] *Id.*

[30] *Johnson v. State*, 628 A.2d 83, 1993 WL 245374, at *1 (Del. June 22, 1993) (TABLE) (citing *Hutchins v. State*, 153 A.2d 204, 206 (Del. 1959)).

[31] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006).

[32] *See id.* at 148-49.

[33] *State v. Spence*, 2014 WL 2089506, at *4 (Del. Super. May 15, 2014) (citing *Kirkley v. State*, 41 A.2d 372, 376 (Del. 2012)) [hereinafter *Spence I*].

12

determines that no misconduct occurred, then the analysis ends.[34] On the other hand, if the Court finds that prosecutorial misconduct occurred, the next step is to decide "whether the misconduct prejudicially affected the defendant."[35] The Court conducts the test articulated in *Hughes v. State*[36] to determine if the misconduct prejudicially affected the defendant (the "*Hughes* test").[37] The factors are "(1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error."[38] The *Hughes* test factors are not conjunctive, and one factor may outweigh the other two.[39] If the court finds that under the *Hughes* test the misconduct warrants reversal, then it need not apply the test articulated in *Hunter v. State*[40] (the "*Hunter* test").[41] The court will consider the application of the *Hunter* test if it finds that the conduct does not prejudice the

---

[34] *Baker*, 906 A.2d at 148.

[35] *Spence v. State*, 129 A.3d 212, 219 (Del. 2015) (quoting *Kirkley*, 41 A.3d at 376) [hereinafter *Spence II*].

[36] 437 A.2d 559 (Del. 1981).

[37] *Spence II*, 129 A.3d at 219.

[38] *Baker*, 906 A.2d at 149 (citing *Hughes*, 437 A.2d at 571).

[39] *Id.*

[40] 815 A.2d 730 (Del. 2002).

[41] *Baker*, 906 A.2d at 149 (citing *Hunter*, 815 A.2d at 732).

defendant under the *Hughes* test.[42] The *Hunter* test looks at "whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process."[43]

## V. DISCUSSION

Our Supreme Court has acknowledged that "closing argument is an aspect of a fair trial which is implicit in the due process clause of the Fourteenth Amendment by which the States are bound."[44] It is well established that a prosecutor may not misrepresent the evidence presented at trial,[45] is allowed to explain legitimate inferences that can be drawn from the evidence, and is not confined to repeat the evidence that was presented at trial.[46] His role is not only to convict the guilty, but also to protect the rights of the accused and to seek justice.[47]

---

[42] *Spence I*, 2014 WL 2089506, at *4.

[43] *Spence I*, 2014 WL 2089506, at *4 (quoting *Hunter*, 815 A.2d at 733).

[44] *Brokenbrough v. State*, 522 A.2d 851, 860 (Del. 1987) (quoting *Bailey v. State*, 440 A.2d 997, 1003 (Del. 1982)).

[45] *See Williams v. State*, 91 A.3d 563, 2014 WL 1515072, at *3 (Del. Apr. 16, 2014) (TABLE) (citing *Flonnery v. State*, 893 A.2d 507, 540 (Del. 2006)); *see also Hunter*, 815 A.2d at 735 (citing *Morris v. State*, 795 A.2d 653 (Del. 2002)).

[46] *Hughes*, 437 A.2d at 567 (quoting *Hooks v. State*, 416 A.2d 189, 204 (Del. 1980)).

[47] *Id.* (quoting *Hooks*, 416 A.2d at 204); *Hunter*, 815 A.2d 735 (citation omitted).

## Harmless Error Review: Prosecutorial Misconduct

Here, it is clear from the record that the prosecutor had a good faith belief that he was arguing the evidence. It is for this reason that the Court allowed him to continue his closing argument. Albeit inadvertent, the State concedes that it misstated Ms. Chanelle's testimony. Even carelessness on the part of counsel should not be condoned, but should be discouraged.[48] Given the State's concession, while the Court agrees with the State that the statement was not intentionally misrepresented, it was nevertheless improper.

The first foul came when the prosecutor told the jury that Ms. Chanelle identified *Defendant* as entering the Club, as this was inconsistent with Ms. Chanelle's testimony. She never identified Defendant. More problematic is the now admitted misrepresentation that Ms. Chanelle identified the individual who ran in and out past her as the same person seen earlier with two females. The prosecutor dovetails this misstatement with a series of accurate statements on the evidence that gave the jury an inaccurate version of the observations presented through the witnesses. Where some of the evidence was otherwise helpful to the defense on the issue of identity, the misstatements by the State misconstrued the testimony of critical witnesses to support the State's theory.

---

[48] *See Brokenbrough*, 522 A.2d at 860 (citations omitted).

For example, the prosecutor initially admits that the bartender's testimony was not helpful to the State's case. Specifically, that "Crystal Schneider tells us…she sees [Defendant] leave…. She says that she never saw the same guy who was with the girls…come back in. She says that."[49] Isolated, this testimony is favorable to the Defendant who argued that staff saw him leave the Club before the shooting and no one saw him return. However, when the State then immediately follows the bartender's testimony and misstates "**But** Natasha Chanelle tells us that, while she is at the front door, the guy that was with two girls comes running in past her,"[50] it links an incorrect version of Ms. Chanelle's testimony to Ms. Schneider's testimony. With the jury's understanding that Defendant was the person with the two girls, the State created novel observations not in evidence. These incorrect statements rehabilitate the State's case in three critical respects.

First, the State's improper statement that Ms. Chanelle saw the Defendant walk into the Club, misstates that she identified the Defendant. This misstatement allowed the State to argue that Ms. Chanelle then also observed the Defendant running back in to the Club. This was also incorrect as she testified she did not see the face of the man running in and out of the Club. Without these misstatements, the bartender's testimony, originally favorable to the Defendant that he was observed

---

[49] Def.'s Mot., Ex. D at 22:20-23:5

[50] Def.'s Mot., Ex. D at 23:6-8 (emphasis added).

leaving the Club prior to the shooting and was not seen returning, takes on a new meaning. The State sandwiches two misstatements (i.e, that Ms. Chanelle saw Defendant walk in to the Club, and it was the same man she sees running in and out) with the bartender's testimony that she saw him leave the Club. By injecting the conjunction "but," that Ms. Chanelle saw him return, the State now places the Defendant back in the Club, in a location closer in time and proximity to the shooting. It further identifies the Defendant as the running man. These misrepresentations helped advanced the theory that Defendant returned to the Club to shoot the victim.

Secondly, the improper statement gave the State an opportunity to argue the merits of the bartender's testimony that she saw the guy with the two girls running out of the bathroom immediately after the shooting. Argued after the misstatement, the prosecutor continued, "[a]nd when the loud bang happens, we'll go back to Crystal [the bartender]. Crystal says she pops up... she looks over and sees the same guy that threw the drink, the guy that was with the girls, running out of the bathroom."[51] This damaging testimony against the Defendant was presented for the first time at trial. It was also inconsistent with prior statements that she had provided to law enforcement, namely that she was not certain about who she saw from her

_____

[51] Def.'s Mot., Ex. D at 23:11-16.

vantage point after the shooting. Thus, the prosecutor's misrepresentation supported this changed testimony regarding the identity of the shooter.

Finally, the improper statement misstates that Defendant was observed running out of the Club. This was not in evidence. The prosecutor argued correctly "Then, we will go over to the main entrance where Natasha Chanelle says the same guy that ran in past her was the same guy that ran back past her to run out of the club and get into the red car." While this is an accurate statement, her testimony never established that this individual was the person with the two girls, nor that it was the Defendant. Absent the improper statements, Ms. Chanelle's testimony was favorable to the Defendant's theory that another individual ran in and shot the victim. This is supported by Ms. Chanelle testimony that the individual she saw running out immediately after the shooting ran into a car located on the Club's property. This was not the same location where the State argued the Defendant ran to a vehicle.

For all of these reasons, this Court finds that the prosecutor's statements were improper. Therefore, the next step is to determine whether the prosecutor's improper statement prejudicially affected Defendant.[52]

---

[52] *Spence II*, 129 A.3d at 219.

18

## A. *Hughes* Test Analysis

The Court first examines the three factors of the *Hughes* test: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.[53] If *Hughes* test is met and the prosecutor's misconduct was prejudicial under this test, then the Court need not address the *Hunter* test.[54]

This was a close case. Beyond the lack of forensic and physical evidence, the State admitted to the jury that there were inconsistencies in the testimony of the witnesses and deficiencies in the evidence. The prosecutor stated during closing argument that the testimony of the only eyewitness in the bathroom at the time of the shooting, "is inconsistent. It is what it is."[55] He further conceded that Mr. Ocampo "couldn't identify anyone. He could not identify the shooter, he said that he didn't get to see his face."[56] Mr. Ocampo had consumed multiple alcoholic beverages that night, including "ten beers and a few tequilas."[57] When discussing the description of the man seen running out of the Club, the State further

---

[53] *Baker*, 906 A.2d at 149 (citing *Hughes*, 437 A.2d at 571).

[54] *Id.* (citing *Hunter*, 815 A.2d at 732).

[55] Def.'s Mot., Ex. D at 13:10-11.

[56] *Id.* at 13:21-23.

[57] *Id.* at 13:5-6.

acknowledged that "the descriptions are all over the place with respect to the clothing."[58] Accepting its weaknesses in the case, the State presented the diagram of the five witnesses and stated "[s]o, ladies and gentleman, if you take what each one said and try to make one harmonious story of it all, do we know what happened? Let's walk through it."[59] Misrepresentations regarding those observations in a close case weighs in favor of finding that they prejudiced the Defendant.

Next, the identity of the shooter was a central issue in this case. The State had to present evidence that Defendant was the shooter. Ms. Chanelle neither identified the Defendant nor did she see the face of the man who ran past her. For the State to say that the man running in and out was the man with the two women improperly misstated facts that went to the heart of this case. The Court finds that this factor weighs in favor of Defendant.

Lastly, the Court addresses the steps taken to mitigate the effects of the error. Unfortunately, the Court did not have the benefit of addressing the impropriety of the statement where the State vigorously argued it was permissible. In retrospect, the Court would have done more to strike the improper statement, advise the jury the prosecutor had erred, and issued an immediate and appropriate curative

---

[58] *Id.* at 7:12-13.

[59] *Id.* at 22:16-19.

instruction. Because of the State's posture at trial that the statement was fair game, this Court finds that the steps taken to mitigate the effects of the misstatement were insufficient.

Under *Hughes*, the prosecutor's improper statements prejudicially affected Defendant's right to a fair trial and it amounts to more than harmless error. A new trial is required. The Court need not conduct a *Hunter* test analysis.

## VI. CONCLUSION

The Court finds that the prosecutor's statements during the State's closing argument prejudicially affected Defendant's right to a fair trial, amounting to more than harmless error, and a new trial is warranted under the *Hughes* test. Under Rule 33, this Court finds that a new trial is required in the interest of justice. Therefore, Defendant's Motion for New Trial is **GRANTED**.

**IT IS SO ORDERED.**

_____
Judge Vivian L. Medinilla

oc: Prothonotary
cc: Joseph S. Grubb, Deputy Attorney General
Zachary D. Rosen, Deputy Attorney General
Eugene J. Maurer, Esquire
Elise K. Wolpert, Esquire
Defendant
Office of Investigative Services

21